**In the Matter of L.W., F.W., Appellant.**

**No. 91–FS–1133.**

District of Columbia Court of Appeals.

Argued May 28, 1992.
Decided Aug. 4, 1992.

**2.** Such abandonment might, however, require us to go en banc. *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971).

Judith A. McInish, Washington, D.C., appointed by this court, for appellant.

Marion E. Baurley, Washington, D.C., for appellees P.R. and Mrs. P.R.

Before SCHWELB and KING, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:

F.W., the biological father of L.W., a girl now seven years of age, appeals from an order of the trial court granting the petition of Mr. and Mrs. P.R., L.W.'s former foster parents,[1] to adopt her over his objection. Following an evidentiary hearing, Judge Joan Zeldon issued a comprehensive written decision in which, among other things, she found by clear and convincing evidence that the proposed adoption would be in L.W.'s best interest. Contending that the trial judge failed to accord adequate consideration to his status as a natural parent and to his efforts to establish a relationship with L.W., the biological father asks us to vacate the order granting the petition to adopt. Although our emphasis is in some respects different from the trial court's, we affirm.

I

THE TRIAL COURT PROCEEDINGS

L.W. was born on July 23, 1985. Her biological mother suffered from diabetes and from serious psychological disorders.[2] The biological father is afflicted with delusions and other personality disorders which make it difficult for him to control his impulses. As a child of a diabetic pregnancy, L.W. was at high risk for cognitive difficulties. As "a direct result probably of the insults to the brain that occurred at birth," L.W. is of borderline mental capacity. She also suffers from an asthmatic condition which has required frequent hospitalizations and constant attention.

---

1. For convenience, we sometimes refer to Mr. and Mrs. P.R. as the R.'s or as the adoptive parents. It should be noted that, prior to the entry of the decree of adoption, they were in fact L.W.'s foster parents.

2. The mother's parental rights to a daughter who was born to her in 1979 had been terminated by court order in April 1983.

The beginning of L.W.'s life was not auspicious. Her mother, evidently preoccupied with her own problems, left the hospital without taking L.W. home with her.[3] Her father, who was then living with the mother, had no contact at all with L.W. during the first twenty months of her life. In fact, the father testified in the trial court that his association with his daughter while the child's mother was alive was as follows:

> [W]hen her mother [would] go visit her, and she did go visit her, I would ask what she's doing.[4]

The father provided no financial support for the child, nor was he asked to do so.

After leaving L.W. in the hospital, the biological mother continued to be uncooperative, and a neglect proceeding was duly instituted in the Superior Court. L.W. was placed in foster care, and she was eventually committed to the custody of the Department of Human Services (DHS). On April 28, 1986, after having lived for several months with another family, L.W. was moved to the home of Mr. and Mrs. P.R., who became her foster parents and whose subsequent adoption of her is the subject of this appeal. The P.R.'s, who have also opened their home to more than thirty other foster children, had no intention at that time of adopting L.W. Nevertheless, L.W., who was nine months old when she came to live with the adoptive parents, has been with them ever since—a period of more than six years.

In January 1986, L.W.'s biological mother died at the age of thirty. While arrangements were being made for the funeral, the deceased woman's father told L.W.'s biological father the name of L.W.'s

social worker. The biological father contacted the social worker, and a visitation program was promptly inaugurated. The biological father's mother (L.W.'s paternal grandmother) and his new paramour, C.C.—a woman with a young teen-aged son, K.C.—also played roles in this visitation, as the biological father lived with each of them at different times.

The testimony at the hearing revealed that although the biological father visited L.W. regularly, and although he and L.W. developed some affection for one another, the visitation program encountered significant problems. There was evidence that in October 1988, during a visit to the home of the biological father's girlfriend, the girlfriend's young son sexually abused L.W., who was then three and a half years old, causing a tear in her vagina. Following this incident, L.W. began to stab dolls between the legs with pencils, and attempted to urinate standing up, like a boy. She also became nervous in the presence of her biological father and destroyed or cut up some of the presents which he had given her.[5] Home visits were terminated after the discovery of the abuse, but the biological father continued to visit L.W. at the social worker's office. There was testimony that other problems arose during the visitation because the biological father and paternal grandmother allegedly failed to give L.W. her medicine or to appreciate the seriousness of her medical problems and the acuteness of her needs.

█ Some time after the apparent sexual abuse of L.W. came to light, counsel for L.W. filed a petition to terminate the biological father's parental rights (TPR petition).[6] The petition came before the court

---

3. The mother had likewise left the hospital after the birth of her first daughter without taking that child home.

4. Although the record is not entirely clear as to the biological father's reasons for not having any contact with L.W., he indicated that the biological mother wanted him to look after her [the mother] instead.

5. There is no evidence that the biological father sexually abused L.W. He indicated at the hearing that he doubted that his daughter had been abused at all, stating that she did not complain

and that she could have been injured while rough-housing with his girlfriend's son. L.W. told the foster parents, however, that "[K.C.] hurt you," apparently meaning "hurt me," and a medical examination revealed the injury to the vagina.

6. The record on appeal includes the oral and written decisions denying the TPR petition, but little else regarding the TPR proceedings. This is because the trial judge in the adoption case repeatedly expressed concern that she would be committing reversible error if she considered materials from the record of the neglect pro-

well before the present adoptive parents had decided to adopt L.W., and no immediate adoption was then in prospect. *See In re A.B.E.*, 564 A.2d 751 (D.C.1989); *cf. In re A.W.*, 569 A.2d 168 (D.C.1990). On May 22, 1989, the TPR petition was denied by Judge Margaret Haywood. The judge ruled that although the biological father had used poor judgment on some occasions, his relationship with his daughter had improved, and his mental condition did not disqualify him from eventually becoming a parent to his daughter.[7] Judge Haywood concluded that counsel for the child had not shown by clear and convincing evidence that the father's parental rights should be terminated. L.W.'s attorney moved for reconsideration and, on July 7, 1989, Judge Haywood denied that motion in a written order.

On June 7, 1989, at a review hearing before Judge Nan R. Huhn, the biological father, having prevailed two weeks earlier over the effort to terminate his parental rights, requested the court to vacate L.W.'s commitment and to award him custody of L.W. After granting the biological father several continuances, Judge Huhn held an evidentiary hearing. On November 6, 1990, the judge denied the motion in a lengthy oral decision which has been made

a part of the record on appeal in this case.[8] Judge Huhn found, among other things, that there had been "an enormous amount of bonding" between L.W. and Mr. and Mrs. P.R., and that

> it would be extremely detrimental to [L.W.] to be removed from the [P.R.s'] home. And although, as I said earlier, this decision is always subject to review, I must say that absent some change in the [P.R.s'] relationship with [L.W.], it will probably only strengthen and become more detrimental in the future to remove her as the bonding will only get deeper.

The judge further found that L.W. has severe problems and "needs all the things in a parent that I'm afraid [the biological father] is not." She explained that the child is "safe" with the adoptive parents, while the biological father suffers from brain dysfunctions and poor impulse control which have led him to be "Pollyannish" and insensitive both to the sexual abuse incident and to his daughter's asthmatic condition and learning problems. Judge Huhn was of the opinion that "to remove this child to an unstable, nonsupportive and below average intellectual environment would be totally adverse to her best inter-

---

ceeding. She referred to a "practice in this court for judges considering the adoption case not to read the neglect jacket." The judge stated in reference to the neglect proceeding that "I don't know what happened before and I don't want to know what happened before."

Although we appreciate the judge's efforts to maintain her impartiality and to operate with a defined and finite record, we think it important to emphasize once again that where, as here, the future of a child is at stake, the judge should do her (or his) best to obtain all of the information needed to effect a judicious disposition. *See In re O.L.*, 584 A.2d 1230, 1233 (D.C.1990). The rigorous application of evidentiary rules is out of place in a case of this kind, *see In re Adoption of a Minor*, 79 U.S.App.D.C. 191, 199, 144 F.2d 644, 652 (1949); *In re Jordet's Petition*, 80 N.W.2d 642, 648 (Minn.1957), and technical defects will not be given primacy over the best interest of the respondent. *In re S.G.*, 581 A.2d 771, 783 n. 17 (D.C.1990). D.C.Code § 16–309(b) (1989), which authorizes the court to consider "such evidence as the parties and any other properly interested person may present," does not suggest the contrary. *See also id.* § 16–2316(b). Judges are expected to be able to

distinguish testimony which has been subjected to cross-examination from other evidence which has not (*e.g.* the extensive and valuable information which can often be found in the respondent's social file) and to accord appropriate weight to each. *S.G., supra,* 581 A.2d at 776–77 n. 7.

Contested adoption proceedings are adversarial, but this is not a dispute over money between two private entrepreneurs. Here, the judge's independent duty as *parens patriae* to act in the child's best interest cannot be effectively carried out if artificial restrictions are placed on the scope of his or her inquiry.

7. The record does not reflect what, if any, medical testimony was introduced as to the biological father's mental health. In her order denying L.W.'s motion for reconsideration, Judge Haywood wrote that "[t]here was no evidence presented that showed a serious incapacitating mental illness, nor even an illness creating irresponsibility to the degree that lack of love and concern for the Respondent would be the result."

8. The biological father did not appeal from Judge Huhn's order denying him custody.

est and destructive to her physical and emotional feeling." [9]

On June 1, 1990, while the biological father's motion for custody was pending, the adoptive parents filed their petition to adopt L.W. Explaining this change in their plans, the adoptive mother testified that she and her husband had not originally intended to adopt L.W., but that they "fell deeper in love" with the child, and that the love "just grew and grew and grew and grew," until they "decided to make her a permanent part of our family if it was possible." On October 2, 1990, DHS filed a Report and Recommendation in which the agency urged that the petition be granted. The biological father declined to consent to the proposed adoption, and an evidentiary hearing was held before Judge Zeldon. The judge found that the biological father had failed to grasp his constitutionally protected "opportunity interest" to parent L.W., *see Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *In re Baby Boy C.*, 581 A.2d 1141 (D.C.1990) (per curiam), and that he was not psychologically equipped to care for a child with L.W.'s special needs. The judge further found, by clear and convincing evidence, that the adoption was in L.W.'s best interest, and she granted the petition of Mr. and Mrs. P.R. to adopt L.W. A final decree of adoption was issued on August 14, 1991. This expedited appeal followed.

## II

## LEGAL DISCUSSION

*A. An Overview.*

One pre-eminently significant fact in this case accounts for everything that has happened to L.W., and decisively affects each issue and sub-issue which has been presented to us by the parties. As a direct result of the failure of L.W.'s biological mother and father to take her home from the hospital or to assume any parental or other responsibility for her, L.W. was placed in the prospective adoptive parents' home be-

fore she was a year old. She has remained there for more than six years. Predictably, she has formed the closest possible emotional ties with the P.R. family and has become a member of it. Dr. Susan Van Ost, a psychologist who testified as an expert for the adoptive parents, stated that "there is clearly an attachment to the [R.'s]" and that "there is fear and sadness about the possibility of losing them." In the words of Judge Huhn, L.W. "has found her parents and it is [Mr. and Mrs. R.]." Judge Zeldon reached essentially the same conclusion, noting that "petitioners and L.W. are part of a preexisting unit—namely, the [R.] family," and that L.W. is afraid of losing the only parents she has known. The dispositive "real life" issue in this case is whether it would be to L.W.'s detriment if these profound ties were now severed. *See Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511 (1978).

So far as the record shows, it was not until June 1989, when L.W. was almost four years of age, that her biological father first requested that L.W. be moved from her adoptive parents' home and placed in his custody. L.W. is now seven years old. She has extensive special needs which many parents of above average resourcefulness would find difficult to accommodate. The biological father loves her, but his capacity to deal with her problems is in serious question.

The father asks us to deny the adoption petition, asserting instead his own right to raise his daughter. To grant his request would mean wrenching L.W. away from the *de facto* parents who have loved her and successfully cared for her for almost all of her life. She would have to live instead with a psychologically impaired biological father in whose care she was evidently sexually abused, and whose ability to appreciate her special needs is questionable. Although the father is undoubtedly a decent man whose situation evokes one's sympathy, any humane and impartial judge acting as *parens patriae* in L.W.'s behalf

---

**9.** Judge Huhn also found by "more than" clear and convincing evidence that the biological father had not protected his opportunity interest.

She cautioned counsel, however, that "these are not binding decisions on the adoption judge."

would surely be loath to take the kind of risk with this child's future which the biological father is asking us to take.[10] As Judge Huhn explicitly stated in denying the biological father custody, and as Judge Zeldon essentially found in grounding her decision in part on L.W.'s role in an intact family unit, ties that bind have been formed over the years, and the bonding between the adoptive parents and L.W. continues to grow as time marches on. It would be plainly detrimental to L.W.'s interest, under these circumstances, to remove her from the serenity and security of her home with the parents on whom she has come to depend and to leave her instead in the care of a biological father who ignored her existence during the first twenty months of her life and who thus caused her to forge the ties which he now asks the court to break.[11]

In *In re Hazuka's Adoption*, 345 Pa. 432, 435–36, 29 A.2d 88, 90 (1942), the court affirmed a contested adoption in language peculiarly apposite to the present case:

> When, in pursuance, perhaps, of the abandonment,[12] new ties have been formed, and a new station in life has been taken by the child, it might be unjust that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. The Tyrrells have had possession of the child, following the abandonment by its mother, since April 6, 1940, have given it loving care, and have won its affection to such an extent

that the court below states that to separate it from them now and to refuse to allow them to adopt it would be ruthless beyond description.

(Citations and internal quotation marks omitted).

### B. General Considerations.

In adoption cases, as in other disputes affecting the future of a minor, the decisive consideration is the best interest of the child. *In re Petition of J.O.L.*, 409 A.2d 1073, 1075 (D.C.1980). The court's inquiry in assessing that interest is fact-specific and practical, not doctrinal, for:

> a court, in making a determination as to the best interest of a child, [must] make the determination upon specific evidence relating to that child alone. As one court has aptly noted, magic formulas have no place in decisions designed to salvage human values. *Lemay v. Lemay*, 109 N.H. 217, 218, 247 A.2d 189, 191 (1968).

*Bazemore v. Davis*, 394 A.2d 1377, 1383 (D.C.1978).

Presumptively, a natural parent has a right to the companionship, care and custody of his or her children. *See, e.g., Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640 (1981). "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child ..., his interest in personal contact with his child acquires substantial protection under

---

10. Technically, L.W.'s custody is not at issue in this case. Nevertheless, the only conceivable basis for denying the petition by the adoptive parents would be to enable her biological father to assume custody. No one has suggested that the uncertainty of continued foster care for an indefinite period would be in L.W.'s interest.

11. "Time having passed, the fact that Baby Boy C. has been living with the prospective adoptive parents throughout the trial and appellate court proceedings cannot be ignored since early permanence and stability may exist by the time a custody decision is rendered upon remand." *Baby Boy C., supra*, 581 A.2d at 1189–90 n. 17 (Rogers, C.J., concurring).

The biological father complains that the bonds between L.W. and the adoptive parents were strengthened, and his own opportunity to form ties with his daughter impaired, by obstacles which the DHS social workers allegedly

placed in his path when he sought to visit his daughter more frequently. It appears that these difficulties were precipitated by the suspected sexual abuse of L.W. by his girlfriend's son. In any event, this problem arose years after the bonding between L.W. and the R. family was under way. But even if, as Judge Haywood suggested in her order denying the TPR, the social workers might have been more cooperative, *cf. In re D.R.M.*, 570 A.2d 796, 807 (D.C. 1990) (warning against possible "adoption juggernaut"), the remedy cannot be to prohibit an adoption which is demonstrably in L.W.'s interest; the child cannot be punished for the alleged wrongs of the bureaucracy.

12. In the present case, for reasons explicated at n. 23, *infra*, we do not reach the question of abandonment.

the Due Process Clause." *Lehr, supra,* 463 U.S. at 261, 103 S.Ct. at 2993 (citations and internal quotation marks omitted). "[A] child's best interests are presumptively served by being with a parent, providing that the parent is not unfit." *S.G., supra,* note 6, 581 A.2d at 785. This holds true even where, in a contest between a biological parent and a non-parent, the latter is in more favorable financial circumstances. *Bell v. Leonard,* 102 U.S.App.D.C. 179, 184, 251 F.2d 890, 895 (1958).[13] A stranger is therefore ordinarily precluded from adopting a child over the objection of a biological parent. D.C.Code § 16–304(a) (1989). In the District of Columbia, however,

> [t]he court may grant a petition for adoption without any of the consents specified in this section, when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child.

*Id.,* § 16–304(e).

■ This court has held that § 16–304(e) incorporates into the best interest standard a preference for a fit unwed father who

has grasped his constitutionally protected opportunity interest. *Baby Boy C., supra,* 581 A.2d at 1143. This preference may be overridden if it is shown by clear and convincing evidence that the proposed adoption is in the best interest of the child, *id.,* for that interest is the paramount consideration. *In re A.C.,* 597 A.2d 920, 925 (D.C. 1991); *Wells v. Wells,* 11 App.D.C. 392, 395 (D.C.1897). At least where, as here, the child has never lived with the biological father, no finding of parental unfitness is required. *In re K.A.,* 484 A.2d 992, 997–98 & n. 2 (D.C.1984); *see also In re P.G.,* 452 A.2d 1183, 1184–85 (D.C.1982).

For purposes of proceedings to terminate parental rights, the TPR statute, D.C.Code § 16–2353(b) (1989), sets out several factors relevant to the best interest of the child. *K.A., supra,* 484 A.2d at 995.[14] An adoption over a biological parent's objection effectively terminates that parent's interest, and we have upheld the application of these standards to contested adoption proceedings. *D.R.M., supra,* 570 A.2d at 804–05. Judge Zeldon addressed most of these factors in some detail in her written

**13.** As the court stated in *Bell, supra,* 102 U.S.App.D.C. at 184 n. 20, 251 F.2d at 895 n. 20 (quoting *People ex rel. Kropp v. Shepsky,* 305 N.Y. 465, 469, 113 N.E.2d 801, 804 (1953)),

> [i]n no case may a contest between parent and nonparent resolve itself into "a simple factual issue as to which [affords] the better surroundings, or as to which party is better equipped to raise the child." * * * And that is true even if the nonparent initially acquired custody of the child with the parent's consent. * * *

**14.** Section 16–2353(b) provides in pertinent part:

> In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development of the concept of time of children of different ages;
> (2) the · physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

> (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including the foster parents;
> (3A) the child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the .child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship with the child;
> (4) to the extent feasible, the child's opinion of his or her own best interests in the matter;
> (5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to.... D.C.Code sec. 6–2101 *et seq.* Evidence of continued drug-activity shall be given great weight.

In *D.R.M., supra,* we found no reversible error where the trial judge had applied the § 16–2353(b) criteria without addressing the somewhat different and more general (but not inconsistent) requirements of the adoption statute. *See* D.C.Code § 16–309(b) (1989). In the present case, Judge Zeldon made findings favorable to Mr. and Mrs. P.R. with respect to the requirements of both statutes.

decision in the present case.[15] We now consider her findings.

### C. The Need for Continuity of Care.

By enumerating the need for continuity of care as a consideration in determining the best interest of a child, the legislature has recognized the importance, to a child, of stability and permanence. *See also Quilloin, supra,* 434 U.S. at 255, 98 S.Ct. at 554–56. The trial court found in this regard that

> [L.W.] is fortunate in having been placed in foster care with petitioners, who are exceptionally qualified to address all of her needs, based on prior experience with other children, including their hyperactive son and their asthmatic older daughter. L.W. is doubly fortunate that petitioners wish to adopt her and provide her with continuity of care.

This finding is amply supported by the testimony of the social workers and expert witnesses.

There is an especially stark contrast between the promise of stability in the adoptive parents' home and the prospect of change and uncertainty if L.W. were placed in the custody of her biological father. Dr. Kenneth Feigenbaum, a clinical psychologist who testified as an expert on the biological father's behalf, acknowledged that the father suffers from significant personality disorders which would make it difficult for him to care for a child with L.W.'s needs. Dr. Feigenbaum expressed his "feeling" that

> the disabilities that I see do not disbar him from being an adequate parent given her severe problems, but the hedge is I'd like to try it out.

He suggested in effect that the petition for adoption be denied without prejudice, that L.W. be placed in the biological father's custody, and that the adoptive parents file a new petition if this arrangement did not work out. He so proposed notwithstanding his recognition that "[t]he general rule is the less bouncing around the better." As Judge Zeldon observed in her written decision,

> Dr. Feigenbaum's proposal demonstrates that even he questions whether F.W. can provide the continuity of care required for this special needs child. By contrast, Dr. Feigenbaum, who visited the home of the R. family, expressed no doubt about the ability of petitioners to continue to provide L.W. with continuity of care.

We agree with the judge. Given L.W.'s needs and her father's limitations, we think the kind of experiment contemplated by Dr. Feigenbaum would not only "bounce [L.W.] around," and thus disrupt the continuity of her care, but also generate altogether unacceptable risks to her psychological (and perhaps physical) health and welfare.[16]

### D. The Physical, Mental and Emotional Health of All Involved.

The testimony established, and the trial judge found, that L.W. is a "special needs" child. She has been hospitalized for asthma as an inpatient twelve to fourteen times and treated as an outpatient approximately twenty-five times. I.Q. testing places her "at the lower end of the borderline range of intelligence, and [L.W.] will require special education throughout her school career." She is also receiving speech therapy and occupational therapy. Caring for her is obviously a challenging task.

The evidence at the hearing established that the adoptive parents are well qualified to provide L.W. with the care and supervi-

---

**15.** The judge did not address § 16–2353(b)(3A), which had been enacted only months before her decision, and which appears to address the problem of "boarder babies." Since L.W. was in fact left at the hospital by her parents, the existence of this provision tends to support, rather than to detract from, the judge's finding that adoption is in L.W.'s best interest. The judge likewise did not address § 16–2353(b)(5), dealing with drug-related activity, apparently because no such activity was at issue in this case.

**16.** The general atmosphere of uncertainty as to the biological father's plans was compounded by his domestic arrangements. He initially contemplated that L.W. live with him, his girlfriend and her son, but the apartment in which they lived was too small. Later, he proposed his mother, L.W.'s paternal grandmother, as the primary caretaker.

sion which she needs. According to Dr. Van Ost, neither parent suffers from any personality disorder. They have successfully raised a hyperactive biological son of their own; he is now married and gainfully employed. The trial judge found that

> petitioners are very experienced in caring for children and, after five years with L.W., are comfortable and skilled in caring for her physical, mental, and emotional needs.

We discern no reason to question that finding.

The biological father's mental health is far more problematical. According to his own expert witness, Dr. Feigenbaum, the father suffers from a brain dysfunction, albeit a "minimal" one. His conduct and perception of reality have been erratic. A psychological test which was administered to the father resulted in his classification "as having a combination of a depressive personality disorder and obsessive personality disorder and a schizoid personality disorder, and that's not quite schizophrenia." [17] The father's own expert also acknowledged that he found the father "rigid" and inflexible, "Pollyannish," "grandiose," [18] and deficient in impulse control.

Dr. Feigenbaum was of the opinion that, in spite of these problems, the biological father could be educated to address L.W.'s needs. He acknowledged, however, that it would not be a "breeze" to teach him these tasks, and that "to be educated about what would be required to treat a need that [L.W.] would have, he would first have to be accepting of the idea that she actually had the need." The trial judge found that the father was not accepting in this regard:

F.W. may have the ability to be an "adequate" parent to some other child, but he is not a fit parent for this particular child because he denies the existence of her physical and educational limitations. Given his attitude, the Court cannot expect him promptly to recognize an asthma attack by the way she is breathing and take her to the hospital emergency room for care. His denial of her special medical and educational needs, his tendency to procrastinate and think that everything will be all right, and his own need for a consistent daily routine make him inadequate to meet L.W.'s mental, emotional and physical needs.[19]

### E. The Quality of L.W.'s Interaction with her Biological Father and with the Adoptive Parents.

L.W.'s relationship with her adoptive parents has been a splendid one. The trial judge found that L.W.

> calls them "Mommy" and "Daddy," and they treat her as if she were their own child. L.W. has become a de facto member of the R. family, and she does not want to lose them. Additionally, L.W. has a sisterly relationship with petitioners' adopted daughter and grandchild-grandparent relationship with petitioners' parents, whom she visits several times a year at their home in New Hampshire.

Her interaction with her biological father has been more of a "mixed bag." She sometimes called him "daddy" [20] and sometimes "Mr. W." Denise Keeling, a DHS social worker assigned to L.W.'s case, described the child's interaction with her bio-

---

17. Dr. Feigenbaum indicated that he believed that the results of this test may have exaggerated the biological father's personality disorders. He indicated that he would have liked to administer additional tests, but that the father's counsel never requested him to do so.

18. In 1987, for example, the father, a food service worker, expended $399 on a newspaper advertisement announcing his candidacy for the Republican presidential nomination. Dr. Feigenbaum characterized this as a "big, impulsive interlude" and no more than that, but he acknowledged on cross-examination that the father's candidacy was "a bit grandiose" and that

grandiosity is a symptom which one looks for in psychoses, especially schizophrenia.

19. This finding was based in part on the judge's observation of the biological father in court and on her appraisal of his gestures, facial expressions, and body language. Obviously, we are in no position, on the basis of a paper record, to second-guess findings grounded on courtroom realities. *S.G., supra,* 581 A.2d at 774–75.

20. She has called F.W. "daddy with the moustache" and her adoptive father "daddy with the beard."

logical father as more of an "adult-child relationship" than one of father and daughter.

Judge Zeldon found that L.W.'s relationship with her biological father has generally been good, but she also discerned cause for concern:

> Outside ... F.W.'s presence, L.W. has shown by her conduct that the visits frequently caused her enormous stress. Sometimes she became quite agitated, demanding and pouty after visits with F.W.—conduct which was not normal for her. L.W. has destroyed the cards, coloring books, and a snow suit and sweat suit given her by F.W. Moreover, L.W. told Dr. Van Ost in July 1991 that she would cry if she saw F.W. Dr. Van Ost said that L.W. is afraid of losing Mr. and Mrs. R. and also is afraid F.W. may hit her.[21]

### F. L.W.'s Opinion of Her Own Best Interest.

The trial judge also made an explicit finding that in L.W.'s opinion, it is in her own best interest to continue to live with Mr. and Mrs. P.R. The judge based this finding in part on L.W.'s negative conduct, described above, following visits with her biological father, and in part on the testimony of Dr. Van Ost, who concluded that "something about F.W. disturbs L.W." [22]

### G. Other Issues.

Especially in light of the biological father's responsibility for the creation of the ties between L.W. and the adoptive parents, the trial judge's findings with respect to the TPR criteria are dispositive. The judge having found by clear and convincing evidence that adoption by Mr. and Mrs. P.R. is in L.W.'s best interest and, at least implicitly, that removing L.W. from their home would be harmful to her, the scope of our review is limited.

■ The "clearly erroneous" rule applies to Judge Zeldon's factual findings. *Baby Boy C., supra,* 581 A.2d at 1144 n. 1 (Ferren, J. concurring); *see also* D.C.Code § 17–305(a) (1989). "[I]t is the function of the [trial] [c]ourt, not of this court, to determine the best interests of the infant." *In re Adoption of a Minor, supra* note 6, 79 U.S.App.D.C. at 199, 144 F.2d at 652. The trial judge has broad discretion, reviewable only for abuse, with respect to the determination whether the best interests of the child warrant authorizing an adoption without a natural parent's consent. *D.R.M., supra,* 570 A.2d at 803; *Barnes v. Paanakker,* 72 App.D.C. 39, 41–42, 111 F.2d 193, 195–96 (1940). In the present case, we are satisfied that there is a "firm factual foundation," *D.R.M., supra,* 570 A.2d at 803–04, for Judge Zeldon's findings as to where L.W.'s best interests lie. *See*

---

**21.** The adoptive mother testified that on one occasion, the biological father became impatient with L.W. and appeared to be about to strike her. The adoptive mother told the father that this was not an effective way to handle the situation.

**22.** The judge described Dr. Van Ost's experiments as follows:

> Dr. Van Ost gave L.W. a page with a stick figure on it which she called F.W. The doctor then asked L.W. to draw herself on that page. L.W. drew herself in the far corner of the page, exclaiming "far away." Dr. Van Ost then repeated the test, calling the stick figure Mrs. R. L.W. drew herself very close to Mrs. R.
>
> Dr. Van Ost gave L.W. a hypothetical situation in which L.W. was asked to imagine that the teacher sent a note home from school about L.W.'s bad behavior. Dr. Van Ost asked L.W. to imagine how Mrs. R. and F.W. each would respond. L.W. responded that Mrs. R. would have her sit on a chair, and F.W. would

hit her. Dr. Van Ost concluded that L.W. has a genuine fear of F.W. hitting her.

> Dr. Van Ost also gave L.W. a page with two stables drawn on it, one stable labeled "Mr. W." and the other labeled "Mom." Dr. Van Ost asked her to imagine a horse and draw a line showing to which stable the horse would like to go. Dr. Van Ost stated that L.W. drew a line to the stable named "Mr. W."; L.W. explained her response by stating that she wanted Mr. W. to have someone, but did not want it to be her. Dr. Van Ost testified that L.W. is aware that F.W. would like to have her but feels sadness and regret about this because L.W. would like to stay with petitioners and is afraid of losing them.

It may well be that other psychologists might have drawn fewer conclusions, or even different ones, from the data considered by Dr. Van Ost. The trial judge credited the witness, however, and her credibility findings are dispositive.

*A.C., supra,* 597 A.2d at 926. There was no abuse of discretion.

 In light of the foregoing, we need not conclusively resolve two issues to which the parties devoted much of their argument both in the trial court and on appeal. The trial judge having found by clear and convincing evidence that L.W.'s best interests require approval of the adoption, and this court now having sustained that finding, the decision below must be affirmed whether or not the biological father grasped his opportunity interest,[23] and whether or not he would be an "unfit" parent. *Baby Boy C., supra,* 581 A.2d at 1143.[24]

Nor is a remand required or appropriate in this case. The critical finding of fact—that it is in the best interest of the child to be placed with the adoptive parents—has been made by clear and convincing evidence. Assuming that such an unambiguous factual finding can ever depend on the "prism" through which the finder of fact looks at the record, *see id.* at 1183 (Ferren, J., concurring),[25] we are satisfied in the present case that the trial judge's "prism" was not distorted. The judge conscientiously considered the *Baby Boy C.* decision. Even if a father who failed to visit his child during the first twenty months of her life could be viewed as having demonstrated by his later conduct "a full commitment to the responsibilities of parenthood," *Lehr, supra,* 463 U.S. at 261, 103 S.Ct. at 2993, his inattention during those twenty months, which resulted in L.W.'s bonding with Mr. and Mrs. P.R., at least significantly attenuated any parental preference.[26] A remand to require the trial judge to look at the same facts through a "significantly attenuated parental preference" prism instead of through a "no parental preference" prism would, on this record, serve no purpose; the judge has left no doubt as to where L.W.'s interests lie. Similarly, even if the trial judge's findings as to the biological father's limitations in rearing a child with L.W.'s special needs could be viewed as insufficient to show that the father is "unfit," the deletion of this pejorative adjective would not remove the father's very real limitations, nor would it ameliorate their actual and potential negative consequences for L.W.'s emotional and physical health.

### III
### CONCLUSION

The record leaves us with no doubt that, as Judge Zeldon and Judge Huhn both rec-

---

**23.** Judge Zeldon found that the biological father's refusal to assume any parental obligations or to exercise any parental rights "leads to the conclusion that [he] did not grasp his opportunity interest in being L.W.'s parent." Judge Huhn made a similar finding in denying the biological father's motion for custody. The father argues that the subsequent interest in parenting L.W. which he claims to have demonstrated over a period of several years was sufficient under *Lehr* and *Baby Boy C.* Given our disposition, we do not decide the issue, except to note that the biological father's inaction when L.W. was an infant, which led to her placement in the adoptive parents' home and the forging of ties that bind, must be viewed as at least significantly weakening, if not altogether dissipating, any presumptive preference that might otherwise be available to him.

L.W. also contends, and the trial judge found, that the biological father abandoned her and that his consent to her adoption was therefore not required. The father responds that there was no abandonment, and alternatively that even if there was, it has been corrected and its effects dissipated. We do not reach these questions.

**24.** An individual may be a fit parent for one child but not for another. *See In re C.E.W.,* 541 A.2d 625 (D.C.1988) (per curiam) (parental rights terminated, despite parents' affection for son with special needs due to fetal alcohol syndrome, because parents were both seriously deficient in the skills required to raise him).

**25.** *But see Baby Boy C., supra* at 1204 (Belson, J., dissenting), pointing out that the trial judge's finding of fact that removal of the child from his adoptive parents' home would be devastating to him was comparable to a finding that "the arm was broken, the traffic light was red, or that the physician misdiagnosed the patient's physical or mental illness." In Judge Belson's view, such a finding, if supported by the record, is binding on the appellate court irrespective of the legal context in which it was made.

**26.** The biological father obviously knew where his daughter was born, and was not dependent on information from an adoption agency. This is a critical difference between the present case and *Baby Boy C.*

ognized, we are dealing here with a father who, notwithstanding his past failure to be a parent to L.W., sincerely loves his daughter. The rights of such a father are not to be overridden lightly. As Judge (later Chief Justice) Vinson wrote for the court in a similar case more than half a century ago, "[t]o say that a decision ordering or denying an adoption is fraught with deep and serious social significance is but to state the obvious." *Barnes, supra*, 72 App.D.C. at 42, 111 F.2d at 196. This father helped to bring L.W. into this world and now wishes to raise her. His is, at least, a claim to which attention must be paid.

We are satisfied, however, that in this case the trial judge gave thoughtful and conscientious consideration to the interests of all parties, including L.W.'s biological father. Correctly, she accorded controlling weight to the best interest of the child. In her view, that interest weighs heavily in favor of the adoptive parents. Given her findings and the evidence on which they were based, we think she called it right. A contrary disposition would have placed a child's future happiness unacceptably at risk.[27]

For the foregoing reasons, the order appealed from is hereby

*Affirmed.*

---

**27.** We note that on remand in the *Baby Boy C.* case, the same judge found that the uncertainty as to the child's future, generated by the need to relitigate the merits of the adoption, itself did him serious harm. "The child already has paid a terrible price for the legal uncertainty of his status." *In re Baby Boy C.*, 120 Daily Wash. L.Rptr. 1309, 1317 n. 65 (Super.Ct.D.C.1992). In the present case, a remand by this court would likewise exact a terrible price. We discern no appreciable prospect that, on remand, the biological father would win the case, and it would be cruel to L.W., and of little benefit to the biological father, to destabilize L.W.'s life in the interest of enabling the father to pursue a mirage.