### In re S.C.M., Appellant.

### No. 94–FS–960.

District of Columbia Court of Appeals.

Argued Dec. 19, 1994.
Decided Feb. 2, 1995.

---

Karen D. Alvarez, for S.C.M.

Alphonso J. Gonzalez, for D.M.

William G. Dansie, for M.J. and C.J.

David R. Lisansky, for A.H.

Sonia A. Bacchus, Asst. Corp. Counsel, with whom Erias A. Hyman, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for the District of Columbia.

Before FERREN, STEADMAN, and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

In this expedited child neglect appeal, S.C.M., now three and a half years old, has asked this court to set aside an order of the Superior Court conditionally releasing her to the physical custody of her biological mother, D.M., while leaving her in the legal custody of her erstwhile caretakers, M.J. and his wife C.J. (the J.'s). The J.'s support S.C.M.'s appeal. Most of the contentions urged upon us on appeal were not presented to the trial court or are otherwise not properly before us at this time, and we find no error or plain error. Accordingly, we affirm.

## I.

### EVENTS PREDATING THE JULY 26, 1994 ORDER

S.C.M., the little girl who is the subject of this controversy, was born on May 7, 1991. On September 30, 1992, when she was sixteen months old, she was admitted to D.C. General Hospital for treatment of a gunshot wound in her upper thigh. S.C.M. was wearing a cast, and the physicians determined that she had previously suffered a broken leg.

A police investigation which followed revealed that S.C.M. was living in a crowded apartment with her mother, then eighteen years of age, her maternal grandmother, her fourteen-year-old pregnant aunt, and several other small children. The grandmother regularly used cocaine and PCP and associated with a criminally-oriented boyfriend, one of several adults who had brought handguns into the apartment. The unit "reeked" with an offensive odor and was infested with roaches and rodents. S.C.M.'s young aunt

reported that S.C.M. sometimes arose while other members of the household were still asleep and wandered around the apartment. The aunt claimed that when S.C.M. played with objects and sometimes broke them, the mother's response was to discipline her with a belt; the mother denied these allegations. The mother and the grandmother provided the police with hesitant, inconsistent and unconvincing explanations of the child's wounds; the mother subsequently admitted that both women had lied for fear of retribution from the grandmother's criminal associates.

On October 1, 1992, the Corporation Counsel filed a petition requesting the court to adjudicate S.C.M. a neglected child. A hearing was held on the same day before Judge Gregory E. Mize. M.J. was identified at the time as S.C.M.'s father. The judge ordered that S.C.M. be released to M.J. and his wife, C.J., with "the [m]other to have reasonable rights of visitation as arranged by the caretaker."

On October 20, 1992, the mother, alleging through counsel that she had "serious doubts" as to whether M.J. is in fact S.C.M.'s father, filed a motion to establish paternity. H.L.A. tests subsequently established that one A.H. is S.C.M.'s biological father and that M.J. is not.

On January 21, 1993, the scheduled trial date, the parties signed,[1] and Judge Mildred M. Edwards (the trial judge) approved, a stipulation in which the mother

acknowledge[d] that she was aware of problems in [the grandmother's] house, where she and [S.C.M.] lived, and that knowing of these problems, she failed to exercise sufficient and appropriate supervision with respect to [S.C.M.], and as a result the respondent sustained a gunshot wound.

The stipulation provided that the government "will not oppose return of [S.M.] to the mother if the home is approved by court social services and court social services recommends return of the respondent to the home."

---

1. For some reason not apparent from the record, the guardian ad litem did not sign the stipulation, although a line for her signature appears on the document.

It appears that M.J. and his wife provided S.C.M. with excellent care, and the trial judge subsequently expressed her gratitude to the couple. There was, however, a great deal of tension between the mother and the J.'s. During the summer of 1993, the mother alleged that S.C.M. had told her that M.J. had bitten her (S.C.M.) on the vagina. The mother subsequently attempted to retreat from or retract this allegation, and it appears to have been established to the satisfaction of the court's Social Services Division and of a physician who examined S.C.M. that the charge against M.J. was baseless.[2] Nevertheless, the probation officer reported on August 20, 1993, that "[s]ince the biological mother made these allegations the foster father has been prohibited from living in the same house as [S.C.M.] and only permitted supervised visitation."

On September 16, 1993, the trial judge entered a disposition order. She placed S.C.M. in the legal custody of M.J. and C.J. The order stated that the mother was to have visitation "supervised by court social services," but also provided that "unsupervised visits shall be in the discretion of [the probation officer] if the psychological evaluation of respondent and mother indicate [that] unsupervised visits are not to the detriment of the respondent." Subsequent orders dated October 6, 1993, and December 7, 1993, likewise provided that unsupervised visitation was to be in the probation officer's discretion.

In a report dated March 15, 1994, the probation officer reported to the court that S.C.M. had been doing well with M.J. and C.J., and that the mother had been visiting her without incident. The officer stated that she was "pleased with the [mother's] progress (albeit slow, better than none at all)," that "the goal in this case is to reunify S.C.M. with her mother," and that "[s]hould all go well during this period, reunification can be recommended at the next court date." The probation officer added that the mother's living arrangement "needs clarification."

In July, 1994, the probation officer recommended that the mother, who claimed at that time to be living with a female roommate, be allowed to take her daughter home for an overnight visit. Acting upon the advice of S.C.M.'s guardian ad litem (GAL), who told them that overnight visits were not authorized, M.J. and C.J. refused to allow the mother to take S.C.M. The probation officer requested an emergency hearing before the court for July 15, 1994, and counsel were notified by telephone. The GAL was unable to attend this hearing, but counsel for the J.'s was present. At the hearing, the judge observed that M.J. and C.J. "have done beautifully with [S.C.M.]." She stated, however, that overnight visits were the probation officer's "shot to call." She directed counsel for the J.'s to make this clear to his clients.

A regularly scheduled review hearing was held on July 26, 1994. The judge reproved the GAL for obstructing the visitation order. Relying on a report by the probation officer to the effect that the mother had made great progress and that "few mothers have cooperated so fully with this writer,"[3] the judge stated that

> we are talking about a mother-child relationship where the mother has demonstrated a sincere desire to have her child back, be the kind of mother she wants [S.C.M.] to have, and to act in her child's best interest.

The judge issued an order directing that the "child shall reside with mother effective immediately," but that S.C.M.'s private placement in the legal custody of the J.'s be continued, with a review set for October 27, 1994. It is from this order that the GAL filed a notice of appeal on S.C.M.'s behalf.

## II.

### EVENTS SINCE THE JULY 26, 1994 ORDER

On July 30, 1994, in conformity with the trial judge's order, S.C.M. was returned to the physical custody of her mother. In the

---

2. The doctor concluded in her report, among other things, that S.C.M.'s communication skills were insufficient for her to have related this allegation of abuse to her mother.

3. The probation officer further stated that "I also see a mother who is trying. She has tried. You know, she has fallen. She has gotten back up."

days that followed, the GAL initiated a flurry of activity both in the Superior Court and in this court. On or about August 1, 1994, she moved the trial court to stay execution of the July 26 order. She also filed a motion seeking recusal of the trial judge, allegedly for improper *ex parte* communications.[4] On or about the same date, the GAL filed a notice of appeal, and moved this court for a stay of the order, for summary reversal, for a writ of mandamus, and for an expedited hearing. The trial judge, apparently believing herself to be without authority to act on the GAL's motions because an appeal was pending, did not decide the motion to recuse, nor did she stay her order. A motions division of this court granted the GAL's request for an expedited hearing, but denied all other relief.

It appears from various filings of the parties and from the representations of counsel that a review of S.C.M.'s placement was held on October 27, 1994. According to a representation in the District's brief in this court on the merits, filed on November 2, 1994, "the [trial] court continued the present status [at the October 27 hearing] even though reunification has been less than satisfactory to date."[5] The District's brief further stated:

> The [trial] court noted that it has limited jurisdiction because of the pending appeal, and asked the Corporation Counsel to move this [c]ourt to grant a limited remand to enable the Family Division more flexibility to act at the next hearing which is scheduled for December 6, 1994.

The District represented that it would "shortly" file such a motion, but in fact failed to do so until December 13, 1994, a week *after* the review. Because oral argument in this court had been scheduled for December 19, 1994, we carried the motion with the case, and we now dispose of it in this opinion.

### III.

### THE MOTION TO REMAND

■ In general, the filing of a timely notice of appeal immediately transfers jurisdiction of all matters relating to the appeal from the trial court to the appellate court. 9 J. MOORE, MOORE'S FEDERAL PRACTICE, § 203.11, at 3–45 & n. 1 (1994); *see Abrams v. Abrams,* 245 A.2d 843, 844 (D.C.1968). As we explained in *Carter v. Cathedral Ave. Co-op, Inc.,* 532 A.2d 681 (D.C.1987), however,

> [w]hile the line that marks the division between what the trial court may and may not do is usually cast in terms of "lack of jurisdiction," the doctrine is judge-made, designed to avoid the confusion and waste of time that might flow from having two courts deal with a single case at the same time. Hence, it is subject to a common-sense flexibility in application.

*Id.* at 684 n. 7 (citations omitted); *see also Aurell v. Furst,* 539 A.2d 1081 (D.C.1988) (per curiam).

■ The application of the general rule is limited to situations in which the order ap-

---

**4.** This motion was apparently based on the events surrounding the emergency hearing on July 15, 1994, which the GAL did not attend, and on alleged *ex parte* communications between the judge and the court's own probation officer.

**5.** The trial judge's concern was apparently precipitated by the report of the probation officer for the October 27 review which revealed the existence of serious problems with S.C.M.'s placement. The probation officer noted that the mother had moved in with a new paramour (not S.C.M.'s father) without notifying the probation officer. The couple lived in one room of a small "unkempt" apartment with several other adults; the mother's boyfriend revealed that S.C.M. slept "on the floor, sometimes the bed." The mother lied pervasively to the probation officer, claiming, among other things, that the boyfriend was a college graduate (he said he had never attended college). The mother had missed all of her ap-

pointments, had attended only sporadically the Mother/Infant Program in which she had been directed to participate, and had generally failed to comply with the conditions upon which S.C.M. had been released to her.

> The probation officer reported that she had *agonized* over the issue of removal.... It seemed the inevitable disturbing conclusion but at what cost. [S.C.M.] would most definitely be traumatized
> . . . .
> This has been a disappointing review period. [D.M.] has not met the challenge of effectively parenting [S.C.M.]. Deceit compromises trust, and [D.M.], in our opinion, is precipitously close to a recommendation of removal.

(Emphasis in original). The probation officer nevertheless recommended that S.C.M. remain conditionally released to her mother, predicated upon "strict adherence to outlined conditions."

pealed from disposes of the case in its entirety. "[I]f an appeal is taken from a judgment which does not finally determine the entire action, the appeal does not prevent the [trial] court from proceeding with matters not involved in the appeal." 9 MOORE, *supra*, § 203.11, at 3–53. Accordingly, an appeal from an order granting or denying a preliminary injunction does not divest the trial court of jurisdiction to proceed with the action on the merits. *Id.*, § 203.11 at 3–53 to 3–54 & n. 44. "There is no reason to treat a collateral order appeal as transferring the entire litigation to the court of appeals." *Aurell, supra,* 539 A.2d at 1081 (quoting 15 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE, § 3911 at 497 (1976)).[6]

In the present case, the trial judge's order placing S.C.M. with her mother did not, in Professor Moore's words, "finally determine the entire action." Rather, it constituted an interim, experimental measure; the judge commented at the July 26, 1994 hearing that this isn't engraved in stone. We are taking a very significant step in reunifying today but not taking the step of the permanent or more lasting order of an order of protective supervision.

■ We agree with the District's contention that the order appealed from is in the nature of a preliminary injunction, in that the court effectively ordered that S.C.M. be placed with the mother and that the J.'s surrender physical custody of her. *Cf.* Super.Ct.Civ.R. 62(c) (court may suspend, modify, restore or grant an injunction during pendency of appeal).[7] We therefore conclude that the judge was not precluded, during the pendency of this appeal, from proceeding with any of the other issues in the case, including the motion for recusal, the conduct

of conventional reviews, and modification, in light of new circumstances, of orders previously caused by the court. Specifically, the judge's power to revoke S.C.M.'s conditional placement with the mother was not impaired by the filing of the GAL's appeal.

The principles underlying Rule 62(c) apply with particular force in the present situation. S.C.M. is, in effect, a ward of the court, and the judge has the obligation to act in her best interest as *parens patriae. See, e.g., In re L.W.,* 613 A.2d 350, 354 (D.C.1992). In order to carry out that responsibility, the judge must have the broad authority to continue so to act as events unfold and circumstances change, notwithstanding the pendency of an appeal from an interim order. The "common-sense flexibility" to which we referred in *Carter, supra,* 532 A.2d at 684 n. 7, must be invoked here in order to assure that the trial judge can act promptly and effectively, irrespective of the appeal, to prevent harm to S.C.M., and that she may continue to proceed with the case and do what is best for the child. Accordingly, the District's motion for a remand is denied.[8]

## IV.

### THE GAL'S SUBSTANTIVE CONTENTIONS

*A. Plain Error.*

The GAL, with the support of counsel for M.J. and C.J., has presented to this court a substantial number of issues, most of which were never raised in the trial court.

■ In *Miller v. Avirom,* 127 U.S.App. D.C. 367, 384 F.2d 319 (1967), the court stated:

---

6. Although the trial court lacks jurisdiction to modify an order from which an appeal has been taken, it retains jurisdiction to enforce it. *See, e.g., Floyd v. Leftwich,* 456 A.2d 1241, 1243 (D.C. 1983).

7. No party has challenged our jurisdiction to entertain this appeal. We conclude, for the reasons stated in the text, that the order is appealable as an interlocutory order granting an injunction within the meaning of D.C.Code § 11–721(a)(2)(A) (1989); *cf.* D.C.Code §§ 16–2328, –2329 (1989).

8. We note that the judge, apparently entertaining some doubt as to the extent of her authority given the pendency of the appeal, conscientiously invoked the procedure recommended in *Smith v. Pollin,* 90 U.S.App.D.C. 178, 180, 194 F.2d 349, 350 (1952), and requested a remand. Although, in light of our decision, this measure has proved unnecessary, it is often wise to obtain clarification where appropriate and if time permits.

In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort. Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal. Canons of this tenor reflect, not obeisance to ritual, but considerations of fairness to the court and the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact.

*Id.* at 369–70, 384 F.2d at 321–22 (1967) (citations and internal quotation marks omitted); *see also District of Columbia v. Banks,* 646 A.2d 972, 978 & n. 6 (D.C.1994). Where a point has not been preserved, we will disturb the trial court's disposition only where the error was "plain" (in the sense of "clear" or "obvious") and where reversal is required to avoid a clear miscarriage of justice. *Banks, supra,* 646 A.2d at 978. In the present case, synchronization between the GAL's contentions in the trial court and in this court has been lacking.

### B. Paternity By Estoppel.

The first four argument headings in the GAL's brief read as follows:

1. [S.C.M.]'s Relationship to M.J. is filial;

2. D.M. is estopped to deny that M.J. is [S.C.M.]'s father;

3. M.J. legally is [S.C.M.]'s father; and

4. The order of July 26 effectively terminated [S.C.M.]'s relationship with her parent. . . .

So far as we can discern from the record, none of these contentions has been properly preserved, and the trial judge has never been asked to rule on them.

Neither M.J. nor the GAL appealed from the adjudication, based on the H.L.A. test results, that M.J. is not S.C.M.'s biological father. "Whenever the results of the tests and report exclude the alleged parent as the parent of the child, that evidence shall be conclusive evidence of nonpaternity, unless contrary results are received." D.C.Code § 16–2343.1(c)(3) (1989). Any argument to the contrary is plainly out of time. *Id.* § 16–2343.1(b)(1).

■ The GAL and the J.'s contend that the mother told M.J., while she was still pregnant, that he was her child's father. They claim that as a result of these representations, he developed a father-daughter relationship with S.C.M., and that the mother is now estopped from denying his paternity.[9] The GAL cites a number of cases from other jurisdictions, most of which hold that estoppel should operate to preclude a mother "from thereafter bastardizing the child for the sole purpose of furthering her own self-interest. . . ." *See, e.g., In re Boyles,* 95 A.D.2d 95, 466 N.Y.S.2d 762, 764–65 (App. Div. 3d Dep't.1983). No such consideration is present here. Moreover, A.H., who has not been accused of misrepresenting anything to anyone, has been adjudicated S.C.M.'s father. It would not be in the child's interest to have two different men sharing that legal status. Finally, S.C.M. filed a motion to establish paternity in October, 1992, expressing doubt that M.J. was her child's father. Any possible misrepresentation ended more than a year and half before S.C.M. was removed from M.J.'s home.

■ This court has not taken an expansive view of the doctrine of paternity by estoppel, *see, e.g., K.A.T. v. C.A.B.,* 645 A.2d 570, 572–74 (D.C.1994); *Dews v. Dews,* 632 A.2d 1160, 1166–69 (D.C.1993), even where that doctrine has been invoked for the plainly beneficent purpose of attempting to secure support for the child. There being nothing in the record to suggest that the equitable estoppel doctrine was presented below, we conclude that it was not plainly wrong for the

9. According to the brief for the J.'s, M.J. had driven the mother to the hospital to deliver the baby, stood by the mother in the delivery room while the child was born, entered his name on the birth certificate, bought the child's crib, contributed to the child's support, drove the mother to drug rehabilitation sessions, and otherwise manifested his great love for the child.

trial judge to fail to invoke that doctrine on her own initiative when no party ever asked her to do so, and we discern no miscarriage of justice.[10]

### C. Alleged Procedural Irregularities.

The GAL contends that she had no notice that the child might be removed from M.J.'s home at the July 25 hearing. She further claims that an evidentiary hearing should have been held. We disagree with both contentions.

■ The claim of lack of notice is specious. The goal of reunifying mother and daughter appears unambiguously from the stipulation approved by the court on January 21, 1993. The probation officer's report of March 15, 1994, specifically stated that if all went well, reunification could be recommended *"at the next court date."* (Emphasis added).[11]

Turning to the GAL's complaint that there was no evidentiary hearing, we have found nothing in the record to suggest that the GAL ever asked for one, or that she ever sought to present a witness whose testimony the judge declined to entertain. Having been placed on notice several months in advance that the issue of reunification might well arise, the GAL cannot be heard to complain, after the fact, that a procedure which she never requested, and which was different from the norm in Family Division reviews of a neglected child's placement, ought to have been utilized.

### D. The Court's Authority to Issue the Order.

■ The GAL argues that the order conditionally releasing S.C.M. to the mother, while the J.'s retained legal custody, exceeded the judge's authority. We disagree. The applicable statute vests the trial court with considerable latitude in crafting a disposition designed to reunite the family while safe-

guarding the well-being of the child. *See* D.C.Code §§ 16–2323(d), –2320(a) (1989).

Section 16–2323(d) provides:

If the [Family] Division finds that the commitment of the child to a department, agency, institution or person other than the parent is no longer necessary to safeguard the welfare of the child, the Division may order:

(1) the child returned to the home and the provision of supervision or other services; or

(2) *any other disposition authorized by section 16–2320(a).*

(Emphasis added). Section 16–2320(a), in turn, provides the court with six different options, one of which reads as follows:

The Division may make such other disposition as is not prohibited by law and as the Division deems to be in the best interests of the child....

D.C.Code § 16–2320(a)(5).

In this case, the judge proceeded cautiously. She transferred physical but not legal custody of S.C.M. to the mother, so that, as she explained at the hearing, "we can make sure things are going all right before we take the more formal legal step of placing your daughter back with you in protective supervision." The judge did not exceed her authority.

### E. The Court's Alleged Failure to Consider the Best Interests of the Child.

The GAL contends that the trial judge abused her discretion by failing to consider the best interests of the child. The judge indicated that she did consider S.C.M.'s interests, and we take her at her word.

■ In child neglect cases, as in all proceedings affecting the future of a minor, the decisive consideration is the best interests of the child. *In re S.G.*, 581 A.2d 771, 785 (D.C.1990). "[A] child's best interests are

---

10. We note that, because M.J. is not S.C.M.'s parent, the court's order did not interfere with a parent-child relationship.

11. In fact, the GAL wrote in her own Report, prepared in connection with the disposition hearing in May, 1993, that "if the [c]ourt determines that [S.C.M.] should be returned to her mother's

custody," certain preparatory steps should be taken first. She was thus obviously aware that reunification with the mother was contemplated in the future; the probation officer's March 15, 1994 report told her that such a proposal would be considered at the July 26 review.

presumptively served by being with a parent, provided that the parent is not unfit." *Id.; see also L.W., supra,* 613 A.2d at 355–56.

The trial judge stated during the course of the hearing that our system "has as its goal certainly the best interests of the child but also ... permanency and family reunification." This statement, in our view, effectively capsulizes the relevant considerations, and we have no reason to believe that the judge failed adequately to consider S.C.M.'s welfare. It is important to note here that no party was requesting termination of the mother's parental rights, and no petition to adopt S.C.M. was pending. Insofar as a possible permanent solution was concerned, reunification was the only available option. Protracted retention in temporary foster care is generally not in a child's interest. *See, e.g., Smith v. Organization of Foster Families,* 431 U.S. 816, 835–36 & n. 37, 97 S.Ct. 2094, 2105 & n. 37, 53 L.Ed.2d 14 (1977) (citations omitted).[12]

### F. Visitation.

The order of July 26, 1994 does not provide for visitation between S.C.M. and the J.'s. Because the mother vehemently opposed such visitation, the judge, in announcing her oral decision,[13] thought it best to leave it to the mother's therapist, who would be working with the mother, to help the mother to resolve her feelings and to allow visitation. The GAL complains that the judge has improperly delegated her judicial function by this arrangement and, at least implicitly, that the J.'s should have been permitted to visit S.C.M.

We note at the outset that while S.C.M. was living with M.J. and C.J., the judge left it to the probation officer, in consultation with mental health professionals, to determine whether unsupervised visitation would be authorized. So far as we can determine from the record, no objection was interposed by any party to this apparent delegation, although the GAL vigorously objected to the *fact* of overnight visitation. The GAL likewise did not object to the denial of visitation rights, or to delegation of authority insofar as visitation by the J.'s was concerned, either during the July 26, 1994 hearing or in her subsequent motion for a stay. Thus, even assuming, *arguendo,* the applicability to a non-parent legal custodian of the statement in *Hamel v. Hamel,* 489 A.2d 471 (D.C. 1985),[14] that "[i]t undoubtedly would be improper for a court to suspend visitation until such time as a physician deems appropriate," *id.* at 475, it does not appear that the point was ever presented to the trial court.

Moreover, this appeal was taken from the order of July 26, 1994. It is not apparent from the face of that order that the interests either of S.C.M. or of the J.'s were impaired by the judge's decision. If S.C.M.'s therapist authorized visitation, there would be no cause for complaint. If the therapist took a contrary position, then the trial judge would surely be available to review her decision. We perceive no basis for reversal of the July 26 order on the visitation issue.[15]

---

12. We are not unmindful of the unfortunate conditions that led to S.C.M.'s removal from the home. The judge's request for a limited remand reflects that she, too, is concerned about the situation, especially in light of the probation officer's October 1994 report. We are therefore confident that the judge will monitor the situation carefully and promptly take steps to protect S.C.M. if her physical or emotional welfare is endangered. To paraphrase one of our precedents, the "humane and impartial judge acting as *parens patriae* in [S.C.M.'s] behalf [will] surely be loath to take [any unnecessary] risk with this child's future...." *L.W., supra,* 613 A.2d at 354–55.

13. The judge's written order contains no provision regarding visitation rights.

14. *See also Lewis v. Lewis,* 637 A.2d 70, 72–73 (D.C.1994); *Shapiro v. Shapiro,* 54 Md.App. 477, 458 A.2d 1257, 1259 (Md.Ct.Spec.App.1983). Because it has been established that M.J. is not the father of S.C.M., the only basis of which we are aware for his claim of a right to visitation is his status as legal custodian.

15. According to the probation officer's report of October 27, 1994, the J.'s were not then being permitted to visit S.C.M., the therapist being of the opinion (with which the probation officer agreed) that if visitation were allowed, S.C.M. would be caught in the middle of the tension between the young adults. The trial court's disposition of the issue in light of that report is not before us. We note, however, that the judge remarked at the July 26 hearing that if S.C.M.'s contact with the J.'s were terminated, it would be

V.

*Affirmed.*[16]

## CONCLUSION

For the foregoing reasons, the order appealed from is hereby

"extremely hard for her to have any comprehension of why these people, who ... up until now have been terribly important to her and loved by her, are no longer in her life." *See also In the Interest of Ashley K.*, 212 Ill.App.3d 849, 156 Ill.Dec. 925, 949–50, 571 N.E.2d 905, 929–30 (Ill.App. 1st Dist.1991), in which the appellate court emphatically reversed an order denying visitation right to long-term foster parents on somewhat comparable facts.

16. The GAL's motion for recusal has not been acted upon by the judge, and it would be premature for us to address it.