## In re BABY BOY C.

### H.R., Appellant.

### No. 92–FS–147.

District of Columbia Court of Appeals.

Argued Sept. 30, 1992.

Decided Aug. 19, 1993.

---

Stephen A. Fennell, with whom Steven J. Barber and Thomas C. Jones, Jr., were on the brief, for appellant.

Leslie Scherr, with whom Susan L. Biro and Arthur G. Sapper were on the brief, for appellees.

Before FERREN, TERRY, and WAGNER, Associate Judges.

TERRY, Associate Judge:

This case comes before the court for the second time. It involves the adoption of a child known in court records as "Baby Boy C.," the son of L.C. (the mother) and H.R. (the father and appellant). Mr. and Mrs.

O., with whom custody of the child was placed soon after birth, filed a petition for adoption in the Superior Court. After extended litigation, that court granted the petition, finding by clear and convincing evidence that adoption by the O. family was in the child's best interest. In the father's appeal from that ruling, this court remanded the case to the trial court with directions to apply the statutory "best interest of the child" standard,[1] while at the same time recognizing "a preference for a fit unwed father who has grasped his opportunity interest." *Appeal of H.R.*, 581 A.2d 1141, 1143 (D.C.1990) (hereafter *"H.R. I"*). Because the original trial judge had died while the appeal was pending, a second trial was held before a new judge in October 1991. About three months later, that judge issued a memorandum opinion and order granting again the petition for adoption. *In re Baby Boy C.*, 120 Daily Wash.L.Rptr. 1309 (D.C.Super.Ct. January 3, 1992).

Once again the father noted an appeal. He now presents, for the second time, a challenge to the constitutionality of the "best interest of the child" standard as applied by the trial court in ruling on the adoption petition, asserting that this standard violates his "substantive due process" rights. Additionally, appellant argues that the trial court's findings of fact are clearly erroneous. We hold that the law of the case doctrine bars us from reconsidering the best interest standard as previously applied in *H.R. I.* We further hold that the trial court's factual findings are amply supported by the evidence and that its legal conclusions do not reflect any abuse of discretion. We therefore affirm the final order of adoption.

I

A. *Background*

C. was born on August 5, 1983, in the District of Columbia.[2] The child's mother,

---

1. D.C.Code § 16–304(e) (1989).

2. Although court documents refer to the child as "Baby Boy C.," he is now ten years old and is obviously no longer a baby boy. We shall therefore refer to him in this opinion simply as "C."

L.C., met the child's father, H.R., while she was teaching in Zaire as a Peace Corps volunteer. Upon learning that L.C. was pregnant, the Peace Corps immediately arranged for her to be transferred back to Washington. Although L.C. informed H.R. in a letter that she was pregnant and intended to have an abortion, she in fact continued her pregnancy and later gave birth to C. Ten days after C. was born, L.C. relinquished her parental rights to the Barker Foundation ("Barker"), a private adoption agency licensed by the District of Columbia.

At the time L.C. became pregnant and left Zaire, H.R. was seeking a law degree from the University of Kinshasa.[3] He received his degree and graduated in June 1983. In August of that year, when he returned to visit the university, he found a letter from Barker waiting for him. The letter, which was postmarked in May, notified appellant that L.C. was pregnant and requested that he complete certain forms and mail them back.[4] Appellant immediately wrote a letter to L.C. to ascertain whether in fact she did give birth to a child. L.C. responded with a letter which gave only her telephone number, not her address, and did not mention either the child or the plans for adoption. This exchange of letters was followed by several more, which convinced L.C. that appellant did not understand the concept of adoption (in appellant's words, he believed she was "abandoning the child") and that he wanted her to send the baby to him in Zaire.[5]

On January 25, 1984, a Superior Court judge denied Mr. and Mrs. O.'s request for an interlocutory decree of adoption,[6] concluding that all reasonable steps had not been taken to give the father (appellant) notice of the court proceedings. After further communications among L.C., Barker, appellant, and the court, another judge entered an interlocutory decree of adoption on October 15, 1984, in favor of the O. family, to become final on April 15, 1985, unless set aside on a showing of good cause. Between October and April appellant sent Barker two letters. The first said that if Barker was not going to allow him to make decisions about the child's future, he would assume custody, and the second stated that he had retained an attorney and was asking Barker to inform the court that he was not abandoning his child. On the basis of these letters, filed with the court by Barker on March 11, 1985, the court issued an order to show cause why the interlocutory decree should be set aside.[7] Appellant moved to set aside the interlocutory decree, and on seven separate dates thereafter, extending from June 1985 to May 1986, the court heard testimony on the adoption petition. The court ultimately granted the adoption petition on September 11, 1986, concluding that appellant had failed to grasp his "opportunity interest," and finding by clear and convincing evidence that the adoption was in the best interest of the child.

### B. *The First Appeal*

On appeal in *H.R. I* this court issued four separate opinions. In a two-paragraph per

---

**3.** H.R., a Zairian citizen, currently lives in a suburb of Paris, France. He is a lawyer specializing in international law and the first Zairian to be admitted to the French Bar. He is now married to E.R., who is also a Zairian citizen; together they have one child, S.R.

**4.** Barker sent three forms: an "Admission of Paternity and Consent to Adoption" form, a "Statement of Non–Paternity and Consent to Adoption" form, and a biographical data form. The accompanying letter invited H.R. to call Barker collect if he had any questions.

**5.** On January 17, 1984, appellant himself contacted Barker by telephone, acknowledged paternity, requested clarification of the forms that had been sent to him, and gave an address

where he was most likely to receive correspondence. Two days later, on January 19, Barker received a letter from L.C. in which she said that appellant had recently sent her a letter stating that he did not consent to the adoption and that he would ask for the baby as soon as possible. L.C. also told Barker that she strongly opposed appellant's gaining custody of the baby.

**6.** On September 22, 1983, Barker had placed the child with Mr. and Mrs. O., and on that same day Mr. and Mrs. O. had filed a petition for adoption.

**7.** Notwithstanding these letters, Barker filed a final report with the court on April 5 recommending entry of a final decree of adoption by the O. family.

curiam opinion, the court "addresse[d] the question whether [appellant H.R.] ... grasped his 'opportunity interest' in developing a relationship with his child, and, if so, whether the trial judge applied the correct standard in concluding that [the child's] best interest called for his adoption by the O. family over H.R.'s objection." *H.R. I, supra,* 581 A.2d at 1143.[8] The court was unanimous in holding: "[1] that the statutory best interest of the child standard must be applied in determining whether to grant a petition for adoption by unrelated persons, [2] that the statute incorporates into the best interest standard a preference for a fit unwed father who has grasped his opportunity interest, and [3] that this preference can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with unrelated persons." *Id.*[9] Because the best interest standard, as applied by the trial court, did not incorporate such a parental preference, a majority of the court concluded that "a remand [was] required to apply the best interest standard as properly formulated." *Id.*[10]

Judge Ferren, in a separate opinion, undertook an extensive analysis of four pertinent Supreme Court cases: *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); and *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). *See H.R. I,* 581 A.2d at 1159–1165. Having done so, he concluded that, although an unwed father has no substantive statutory right, he has a "substantive, constitutionally protected liberty interest under the fifth amendment— now commonly called an 'opportunity interest'—in gaining custody of his child." *H.R. I, supra,* 581 A.2d at 1152.[11] Because the Due Process Clause of the Fifth Amendment protects against improper state action, and because it was state action that interfered with appellant's due process rights and his opportunity to seek custody of C.,[12] Judge Ferren took the position that the period during which appellant could claim his constitutionally protected opportunity interest had been "tolled" by that interference. *Id.* Accordingly, Judge Ferren concluded that the Constitution requires that the "best interest" language in the adoption statutes [13] be construed

> to mean that, when a natural father who has not abandoned his "opportunity interest" [in this case because of "tolling"] seeks custody of an infant child whom the mother has surrendered for adoption at birth, he shall be entitled ... to custo-

---

**8.** In *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the Supreme Court held that a non-custodial father has what later cases have described as a constitutionally protected "opportunity interest" in developing a relationship with his child.

**9.** Chief Judge Rogers and Judge Ferren, however, differed as to the manner in which that test should be applied, as we shall discuss hereafter.

**10.** Implicit in the court's decision to remand was a determination that appellant had grasped his opportunity interest. The trial court, as our discussion indicates, had applied the best interest standard but without the parental preference.

**11.** According to the Supreme Court in *Lehr,* "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause." 463 U.S.

at 261, 103 S.Ct. at 2993 (citing *Caban, supra,* 441 U.S. at 392, 99 S.Ct. at 1768).

**12.** Judge Ferren stated that the Barker Foundation, a "District-licensed child placement agency," was deemed a state actor, and that the acts done by Barker, as well as the proceedings in the Superior Court, constituted state action governed by the Due Process Clause. *H.R. I, supra,* 581 A.2d at 1164.

**13.** D.C.Code § 16–304(e) (1989) provides:

> The court may grant a petition for adoption without any of the consents specified in this section, when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child.

D.C.Code § 16–309(b) (1989) permits the court, after considering a petition for adoption and the evidence presented, to

> enter a final or interlocutory decree of adoption when it is satisfied that ...
>
> (3) the adoption will be for the best interests of the prospective adoptee....

dy if he would be a "fit" parent, unless the adoptive parents persuade the court with clear and convincing evidence that failure to terminate the father's parental rights would be detrimental to the best interests of the child.

*Id.* at 1173–1174 (footnote omitted); *see id.* at 1177 (reading statute "to incorporate a parental preference in determining the best interests of the child when an unwed, noncustodial father is fit and has not abandoned his opportunity interest").[14]

Chief Judge Rogers, in a concurring opinion, agreed that appellant had grasped his opportunity interest and that a remand was necessary because the trial judge had failed to apply the best interest standard of the adoption statute, as it had long been interpreted, "to include a presumption in favor of a fit natural parent over a stranger to the child...." *Id.* at 1183. Although Chief Judge Rogers did not join in Judge Ferren's view that *Lehr v. Robertson* created, as a matter of substantive due process, a parental preference, she did conclude that such a preference was "well-established" in District of Columbia case law. *Id.* 581 A.2d at 1185. This interpretation of the statutory standard for adoption, incorporating the parental presumption, was in her view "fully consistent with recognition of the constitutional right of a natural father not to be denied his opportunity interest in seeking custody of his child." *Id.* (footnote omitted). Additionally, Chief Judge Rogers observed that "[n]othing in *Lehr* suggests that the [court's long-standing] statutory interpretation [of the best interest test] is constitutionally defective." *Id.* 581 A.2d at 1187. Moreover, she said, even if there were "some implicit substantive due process right protecting a natural father's interest in taking care and custody of his child, nothing in *Lehr* ... suggests that the best interest standard is inconsistent with due process or that the natural father's right is

preeminent." *Id.* 581 A.2d at 1188 (citations and footnote omitted). Thus Chief Judge Rogers joined Judge Ferren in the conclusion that in an adoption proceeding, a fit parent is presumed to be entitled to custody of his or her child, although, according to the Chief Judge, "[t]hat presumption is rebuttable ... upon a showing, by clear and convincing evidence, that the best interests of the child require that the child be placed in the custody of ... stranger(s)." *Id.* at 1191 (Rogers, C.J., concurring).

Judge Belson, the third member of the panel, dissented from the remand on two grounds. First, he "disagree[d] fundamentally" with the holding of his colleagues that, as a matter of law, appellant could not be "deemed to have 'abandoned' his so-called 'opportunity interest' in developing a parent-child relationship with ... C." *Id.* at 1192. Second, even assuming that appellant had seized his opportunity interest, he would still not be entitled to prevail because of the trial judge's finding that a transfer of custody to appellant would be "detrimental" to the child's best interest. That finding, in Judge Belson's view, was supported by the evidence and was therefore "unassailable...." *Id.*

## C. The Second Trial

At the trial on remand, the court heard testimony from Mr. and Mrs. O., Dr. Allen E. Marans, Dr. Joseph D. Noshpitz, Dr. Albert J. Solnit, and appellant H.R.

Mr. and Mrs. O. testified (separately) that C. is an intelligent, handsome, likable boy with many friends. He also likes sports and games and appears "quite talented" on the piano. Mr. O., whom C. calls "Daddy," said that C. is an integral part of the family and that he and C. do many things together, such as hiking, drawing, reading, and telling stories. Additionally, Mr. O. described the close relationship that C. has with other members of the O. fami-

---

**14.** Judge Ferren wrote that "a court cannot enter an interlocutory decree of adoption ... and override a parent's refusal to consent as 'contrary to the best interests of the child' ... *unless* the parent's custodial rights are terminable under criteria such as those identified in the termi-

nation statute [D.C.Code § 16–2353]." *H.R. I, supra,* 581 A.2d at 1156–1157 (footnotes omitted; emphasis added). Chief Judge Rogers, in her concurring opinion, agreed with this statement of the law. *Id.* at 1185–1186.

ly, including Mr. and Mrs. O.'s late parents, whom C. came to know before they died. He has memories of these "grandparents" and still talks about them. Mr. O.'s mother, in particular, was a book illustrator and gave C. several books which he treasures. C. is also close to Mr. O.'s brother and Mrs. O.'s brother. Recently, Mrs. O.'s brother had a child, and C. felt quite excited that he was "no longer the youngest member of the family." In addition, according to Mr. O., C. has a very healthy relationship with his brother D., so close that "sometimes it almost seems as though one will express what the other is thinking." In fact, Mr. O. testified, D. once said in C.'s presence, "We won't let them take you away," and expressed a desire to testify against C.'s removal from the O. family. Mr. O. said that when the family moved into a bigger home, D. and C. still wanted to share a bedroom even though they could now have separate rooms. It was also D. who approached Mr. and Mrs. O. on C.'s behalf to express C.'s desire to make contact with H.R.[15]

Mrs. O. testified that since C. first became a member of the O. household, she has worked at home. Her testimony showed that she, like her husband, has a close and healthy relationship with C. The two of them often play games together and read to each other. Mrs. O. also said that C. is involved in and looks forward to the family ritual of painting the windows for Halloween. All the family members go to church together on Sunday, say prayers together before going to bed, and travel to their summer home, where C. has made additional friends. The entire family is very sensitive to the racial aspect of their relationship. Both boys are interracial,[16] while Mr. and Mrs. O. are both white. They have succeeded in living in neighborhoods that have "varied populations." Many of their family friends have "transracially adopted children," a fact which has

not escaped the notice of the two boys, one of whom once said, "Daddy, we don't always have to make friends with people who look like us."

Mr. O. described some of the problems that have resulted from C.'s uncertain status in the family. Since the time he learned that the court (in *H.R. I*) did not affirm his adoption, C. has been anxious and does not understand why his brother D.'s adoption is final, but his is not. He appears to try "to be on his best behavior" and has "showed a little kind of tic [in his] eye...." The practical problems associated with his adoption status include the inability of the O.'s to secure a birth certificate, social security number, or passport for C., and the need for an affidavit from Barker before he can be enrolled in school. These facts have been embarrassing to C.

Mr. and Mrs. O. both testified that they had agreed that at some point in the future they would encourage, but not compel, a relationship between C. and his natural father if that was in C.'s best interest. After seeking counseling on the matter, they have told C. about his natural father. In explaining to C. why appellant would not sign his adoption papers and allow him to be part of the O. family, they said, on professional advice, that his father was "mixed up," carefully avoiding other words with a more negative connotation. The O.'s believe "that with the security of an adoption and with the sense of identity of the family, then he could form a relationship with his father that could be as warm and as deep as they wished."

Dr. Allen Marans, after being accepted by the court as an expert in child psychiatry, child psychoanalysis, and adoption, testified in support of the adoption petition. During the month before trial, he met with members of the O. family together and separately.[17] He testified that each mem-

---

**15.** By stipulation of the parties, the circumstances of this contact, which occurred at about the time of the second trial, were not disclosed to the court.

**16.** D. is also adopted. Like C., he is the child of one black parent and one white parent.

**17.** Dr. Marans also met with the O.'s periodically after the first trial to address their concerns about some "learning problems" that D. was experiencing, and also to discuss the effects that the appeal process was having on C.

ber of the family "now feels under some threat"[18] and that granting the adoption petition would have the immediate consequence of "lessening [the] tension within the [O.] household." C. himself has indicated that he knows his natural father is trying to take him back and that he does not want to leave the O.'s.

Dr. Marans opined that "it is not within the best interest of this child for the full decree of adoption not to be granted." Anything that undermines C.'s sense of permanence, he said, would in turn undermine his identity, self-esteem, self-confidence, "and everything he has grown up with." The doctor testified that "impermanence to his most crucial relationships is a threat to his future development and is bound to have ... a direct effect on the child.... Certainly, these periods of trial have been sources of stress, and it's to the family's credit that they've been able to navigate these difficult times. But were it to go on into perpetuity, I think the effects could be devastating." Dr. Marans stated that "adopted children always have somewhere in their minds a fantasy that they could be given away." Later, when the court asked him to clarify this statement, he said it is "harmful to a child to have those fantasies ... with the threat of their being reality. That is harmful to anybody, but to an eight-year-old child, it is unconscionable."[19]

Dr. Marans also discussed appellant's proposal under which the adoption petition would be denied, but the O.'s would retain custody of C., subject to a court-supervised visitation schedule for appellant. Dr. Marans stated that such a proposal was "preposterous" and "horrendous."

[W]here a child has been with a family for a period of time, eight years, where his parents have raised him, to make that into a subordinate kind of relationship, to take away the authority of the parents undermines the entire family structure and puts a tremendous amount of pressure on that child to make a choice, to be making a choice that is not in the child's capacity to make.

Such a plan, he said, would cause the child to have split loyalties that would "promote separation anxieties," "phobias," and "feelings of self-doubt." Moreover, these divided loyalties could be a permanent negative influence on his personality development, "a tightening up as a way of containing stress," which might appear later in life in "symptomatic behavior in a mental illness" or in the form of a "personality construction sacrifice." Dr. Marans pointed out that C. has "a very real potential and probability of developing additional symptoms, neuroses, and anxiety," correcting himself to say that it was "a strong probability." On several occasions Dr. Marans was emphatic in saying that anything short of a formal adoption would be adverse to C.'s best interest.

Dr. Joseph Noshpitz, accepted by the court as an expert in child and adolescent psychiatry, but not adoption, testified at the request of appellant. Having interviewed members of the O. family and members of appellant's family prior to trial, Dr. Noshpitz concluded that it would not be in C.'s best interest to be adopted by the O. family. When appellant's counsel asked him the basis of his opinion, Dr. Noshpitz replied:

Mr. and Mrs. O. don't need an adoption, a legal, formal statement of any kind to be good parents to C. ...

I don't want by saying that to minimize that, but insofar as focus on that one question of the legalization, I don't

18. Dr. Marans added that as a "consequence of the adoption ... there could be a relationship with the birth father that instead of being a threat, could be an additive component to [C.'s] life and his development."

19. Dr. Marans testified that even if C. could be assured that he could remain with the O. family as long as he wished, and even if his natural father assured him of that too, an adoption decree would still be necessary. He reasoned:

A decree of adoption is one that the court has a privilege of providing a family in order to promote permanency. There is nothing more permanent than legal status of being a parent. Without that permanency, the child recognizes what the court can give, the court can take away.

think they need that. I think they want that, but I don't think they need that. *Mr. R., on the other hand, needs that.* That is to say that his—that the recognition, formal recognition that he is the father of this child is for him pretty close to a biological necessity. He is a man who has literally built this latter portion of his life around the urge, the wish, the yearning to achieve that recognition. [Emphasis added.] [20]

Dr. Noshpitz then proposed a plan to "resolve" the situation before the court. He believed that "there ought to be some kind of legal arrangement, a contract, a judge's order ... to ensure for Mr. and Mrs. O. their continued parental attachment [and then] ... some way to bring together the two families." Basically, Dr. Noshpitz was suggesting that custody remain in the O.'s, with visitation rights for appellant. On cross-examination Dr. Noshpitz denied that he had proposed a "transfer" plan during the earlier trial,[21] although he acknowledged that "under the stress of the discussion [he might have] suggested transfer." On redirect examination the next day, however, Dr. Noshpitz admitted that his "proposed plan" had changed between the first trial and the second. In explaining to the court the reason for forgetting his original testimony, Dr. Noshpitz said that he had become "emotionally" involved in the case, and that after testifying about his "transfer" plan at the earlier trial, he had found it so "hurtful" that he had "suppressed it."

As a rebuttal witness, the O.'s called Dr. Albert Solnit, whom the court accepted as an expert in the field of psychological and psychiatric effects of child placement decisions on children. In response to a detailed hypothetical question reflecting the facts of this case, Dr. Solnit testified that there was a "high likelihood" that the hypothetical child would be "significantly harmed" if the adoption petition were denied. Addi-

tionally, the doctor said that if the child were given a choice as to family preference, he would suffer a number of "unfavorable reactions," including depression, lack of motivation, and a "preoccupation with what will happen to [him] next." Thus Dr. Solnit opined that the adoption should be finalized in order to avoid the risk of harm threatening to impede C.'s development.

The last witness was appellant. He said that he no longer took the position that the court should order an immediate transfer of custody of C. from the O.'s to himself because he recognized that such a transfer would be harmful. Appellant testified that his present "plan" for C. would be to C.'s advantage in the long run. He reasoned that if C. were not able to take advantage of his Zairian citizenship, he would be compelled to experience "the same problems as all American blacks." As a Zairian citizen, on the other hand, he could "[p]erhaps present his candidacy to legislative elections and perhaps become one day president of the Zairian Republic." Additionally, appellant hypothesized that when C. returned to him in the future, he would be able to take on the responsibilities traditionally accorded to the oldest child in the Zairian culture.

The court, after considering the factors detailed in the statutes and this court's decision in *H.R. I,* made findings favorable to the O. family and concluded that the best interest of C. required the adoption petition to be granted.

## II

### A. *Law of the Case*

Appellant argues against application of the law of the case doctrine for two reasons. First, he contends that this court's decision in the first appeal did not address his present constitutional claims, but considered only the issue of whether his statu-

---

**20.** From this and other parts of the transcript, it is clear that Dr. Noshpitz's focus was more on the welfare of appellant than on the welfare of the child.

**21.** In his testimony during a hearing in May 1986, Dr. Noshpitz had "advocated a period of transition over several years, during which H.R. and his wife would gradually assume custody." *H.R. I, supra,* 581 A.2d at 1150 (Ferren, J.).

tory and procedural due process rights were violated by the lack of notice to him about the adoption proceedings.[22] Second, he asserts that there have been "factual developments" since this court's decision in *H.R. I* which make the law of the case inapplicable. We reject both contentions. This appeal permits—indeed, compels—a straightforward application of the law of the case doctrine.

It is well established that "once the court has decided a point in a case, that point becomes and remains settled unless or until it is reversed or modified by a higher court." *Kritsidimas v. Sheskin,* 411 A.2d 370, 371 (D.C.1980) (citation omitted); *accord, e.g., Kaplan v. Pointer,* 501 A.2d 1269, 1270 (D.C.1985). This "law of the case" doctrine applies with equal force in a second or successive appeal to a decision rendered in a prior appeal. As this court said only a few months ago:

> It is the "law of the case" principle which precludes reopening questions resolved by an earlier appeal in the same case.... The general rule is that "if the issues were decided, either expressly or by necessary implication, those determinations will be binding on remand and on a subsequent appeal."

*Lynn v. Lynn,* 617 A.2d 963, 969 (D.C. 1992) (citations omitted). Application of this general rule is limited "only where (1) the first ruling has little or no finality, or (2) the first ruling is clearly erroneous in

light of newly presented facts or a change in substantive law." *Minick v. United States,* 506 A.2d 1115, 1117 (D.C.) (citations omitted), *cert. denied,* 479 U.S. 836, 107 S.Ct. 133, 93 L.Ed.2d 76 (1986); *accord, e.g., Halperin v. Kissinger,* 257 U.S.App. D.C. 35, 50, 807 F.2d 180, 195 (1986) (Mikva, J., joined by Robinson, J., concurring), citing *White v. Murtha,* 377 F.2d 428, 431–432 (5th Cir.1967).[23]

In our view, application of the law of the case doctrine to the instant appeal is particularly appropriate. The ruling of this court on the first appeal cannot be characterized as "clearly erroneous in light of newly presented facts or a change in substantive law." *Minick, supra,* 506 A.2d at 1117. There has been no change in the substantive law applicable to this case since *H.R. I* was decided. The constitutional issues presented in that appeal were exhaustively discussed by Judge Ferren and Chief Judge Rogers in their separate opinions. Moreover, recent opinions by this court have cited *H.R. I,* and there is no reason for us to reconsider its holding, even if we were at liberty to do so. *E.g., In re L.W.,* 613 A.2d 350, 356 (D.C.1992); *S.S. v. D.M.,* 597 A.2d 870, 883 n. 35 (D.C. 1991). Finally, when this court has considered an issue of law which is dispositive of the case before it, as in *H.R. I,* that precedent must be followed unless and until it is overruled by the court en banc. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).[24]

---

**22.** Appellant further argues that any discussion in this court's prior opinion beyond the mere recognition of the statutory and procedural due process violations was not necessary to the court's disposition of the appeal and therefore must be regarded as dictum.

**23.** A standard reference work contains the following definition:

> [A]s generally used, [the term "law of the case"] designates the principle that if an appellate court has passed on a legal question and remanded the cause to the court below for further proceedings, the legal question thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain the same.

BLACK'S LAW DICTIONARY 886–887 (6th ed. 1990) (citation omitted).

**24.** Appellant vigorously maintains that *Planned Parenthood v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), effected a change in the law requiring us to reconsider the court's decision in the prior appeal. We fail to see how the Supreme Court's reaffirmation of the essential holding in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), mandates a rethinking of *H.R. I. See Casey, supra,* —— U.S. at ——, ——, 112 S.Ct. at 2804, 2816 (reaffirming a woman's right to terminate her pregnancy before viability). *Casey's* enlargement of the sphere of permissible state restrictions on the constitutional right to an abortion, *id.* at —— ——, 112 S.Ct. at 2823–2825, hardly provides the "change in law" which would render the law of the case doctrine inapplicable here. More fundamentally, we simply are not persuaded that *Casey* has any bearing whatever on the case at bar.

■ Contrary to appellant's assertions, this court in *H.R. I* expressly considered his constitutional arguments and their effect on the statutory standard applicable to an adoption petition. *See H.R. I, supra,* 581 A.2d at 1143 (per curiam), 1172–1174 (Ferren, J.), 1185 (Rogers, C.J., concurring), 1204–1205 (Belson, J. dissenting). In response to "H.R.['s] claims that . . . he had a constitutionally protected liberty interest in developing parental relations with . . . C.," [25] Judge Ferren noted that *"Lehr* and *Stanley* taken together do afford substantive as well as procedural protection, mandating at least a custodial preference for a fit parent who has not abandoned his opportunity interest." *Id.,* 581 A.2d at 1173 (citations omitted). Judge Ferren went on to conclude:

> [T]he Constitution requires us to construe the "best interests" language under the adoption statute . . . to mean that, when a natural father who has not abandoned his "opportunity interest" seeks custody of an infant child whom the mother has surrendered for adoption at birth, he shall be entitled . . . to custody if he would be a "fit" parent, *unless* the adoptive parents persuade the court with clear and convincing evidence that failure to terminate the father's parental rights would be detrimental to the best interests of the child.

Appellant also calls our attention to a recent California case, *Adoption of Kelsey S.,* 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (1992). The court held in *Kelsey S.* that the parental rights of an unwed father who had sufficiently and timely "demonstrate[d] a full commitment to his parental responsibilities" could not constitutionally be terminated "on nothing more than a showing of the child's best interest" without additional evidence of his unfitness as a parent. *Id.* at 848, 4 Cal.Rptr.2d at 635, 823 P.2d at 1236. Assuming that the narrow holding of that case, involving substantial statutory interpretation and extremely fact-sensitive conclusions, could be extended to apply to the case at bar, we decline appellant's invitation to follow it, given the record before us and the law by which we are bound. To the extent that it may be relevant here, *Kelsey S.* appears to be in direct conflict with *H.R. I,* which we are obliged to follow under *M.A.P. v. Ryan, supra.*

**25.** *H.R. I, supra,* 581 A.2d at 1172.

*Id.* at 1173–1174 (citation and footnote omitted; emphasis added). It is abundantly clear from these and similar passages that Judge Ferren specifically considered appellant's constitutional arguments [26] and addressed them in his opinion.

Chief Judge Rogers also focused on appellant's constitutional arguments in her concurring opinion. She rejected the notion (asserted by appellant and adopted by Judge Ferren) that *Lehr v. Robertson* created in a biological parent a substantive due process right to custody. *Id.* 581 A.2d at 1188. However, Chief Judge Rogers went on to say that even if there were "some implicit substantive due process right protecting a natural father's interest in taking care and custody of his child, nothing in *Lehr,* either alone or in conjunction with [*Stanley, Caban,* or *Quilloin*], suggests that the best interest standard is inconsistent with due process or that the natural father's right is preeminent." *Id.* (footnote omitted). Ultimately concurring in the remand, Chief Judge Rogers declared:

> Under our adoption statute, a natural father, who has not abandoned his opportunity interest in seeking custody of his child, is entitled to custody of the child, where the mother has surrendered her parental rights in favor of adoption of the child by a stranger(s), absent a show-

**26.** Judge Ferren summarized the argument that appellant had made to the trial court:

> H.R. argued that the Barker Foundation and the O. family had violated the District of Columbia statute by not providing H.R. with immediate notice of the filing of the adoption petition . . . [and] had deprived him of due process of law by failing to inform him of his legal right to seek custody. . . . H.R. contended that, by failing to receive notice of the adoption proceeding, he was precluded from coming forward to assert his constitutionally protected liberty interest in developing a relationship with his son before the baby had developed a relationship with the O. family. . . . *H.R. then argued that he was entitled to custody of . . . C. because he was fit to serve as his father; a best interests-of-the-child standard should not be applied, he said, because it failed to recognize his liberty interest in a relationship with his child. . . .*

*H.R. I, supra,* 581 A.2d at 1151 (citation omitted; emphasis added).

ing that such custody would not be in the best interest of the child. *Id.*, 581 A.2d at 1189. Judge Belson, although he disagreed with the majority's decision to remand the case, did "agree essentially with them on the test to be applied once an unwed father is found to have diligently pursued his opportunity interest under *Lehr.*" *H.R. I, supra,* 581 A.2d at 1204–1205 (Belson, J., dissenting).

> The statutory standard of the "best interests" of the child means that the child's interests are paramount, with a *rebuttable* presumption that placing the child in the custody of a fit natural father who has come forward and undertaken to act as a father will ordinarily be in the child's "best interests."

*Id.* at 1205 (emphasis added). Thus it is abundantly clear that all three judges who heard the first appeal considered and rejected appellant's constitutional claims on the merits.[27]

Appellant next contends that the law of the case doctrine is inapplicable because the constitutional issues raised in the instant appeal were only "wrestled with" by the court in the first appeal, and therefore any discussion of them amounted to dictum. While it is true that we are not required to follow dicta in a prior opinion, we are bound by applicable precedents unless and until they are overturned en banc. *E.g., Asuncion v. Columbia Hospital for Women,* 514 A.2d 1187, 1189 (D.C.1986); *Punch v. United States,* 377 A.2d 1353, 1360 (D.C.1977), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978); *M.A.P. v. Ryan, supra,* 285 A.2d at 312. Appellant suggests that the holding in *H.R.*

*I* was limited to a ruling that his "right to notice was violated, and that his opportunity interest remained intact." We cannot agree; the decision in *H.R. I* was not so restricted.

The issues before the court in *H.R. I* were whether appellant had grasped his opportunity interest and, if so, whether the trial court had applied the correct standard in concluding that C.'s best interest called for his adoption by the O. family over appellant's objection. *H.R. I, supra,* 581 A.2d at 1143 (per curiam). This court's conclusion in *H.R. I* that appellant had grasped his opportunity interest necessarily led to a discussion of whether the trial court had applied the correct standard. All three judges "agree[d]"—*i.e.,* held—that the best interest test to be applied in a case such as this must "incorporate[ ] ... a preference for a fit unwed father who has grasped his opportunity interest, and that this preference can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with unrelated persons." *Id.* A majority of the court concluded that the case must be remanded because the trial court, although it had applied the best interest test, had not incorporated the parental preference. In the per curiam opinion, the three judges made clear that they unanimously agreed on the standard to be applied by the trial court *and* on the principle that the preference for the father could be overridden by clear and convincing evidence. Although Judge Ferren and Chief Judge Rogers differed on whether the parental preference was constitutionally or merely statutorily compelled,[28] they agreed

27. Appellant argues nevertheless that the law of the case doctrine is not applicable "when fundamental constitutional issues are at stake." The case law plainly does not support this argument. *Safir v. Dole,* 231 U.S.App.D.C. 63, 718 F.2d 475 (1983), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984), on which appellant relies, holds only that "[t]he doctrine does not preclude courts from reexamining issues that go to their constitutional power over the case." *Id.* at 69 n. 3, 718 F.2d at 481 n. 3. The court in *Safir* attributes this holding to *Potomac Passengers Ass'n v. Chesapeake & Ohio Ry.,* 171 U.S.App.D.C. 359, 520 F.2d 91 (1975), in which the court ruled that the law of the case doctrine

would not bar reconsideration of whether the court constitutionally possessed subject-matter jurisdiction. *Id.* at 363 & n. 22, 520 F.2d at 95 & n. 22.

28. On this point Judge Belson agreed with Chief Judge Rogers that the presumption derived from the statute and case law interpreting the statute, not from the Constitution. *See H.R. I, supra,* 581 A.2d at 1192 n. 1 (Belson, J., dissenting). He also agreed that the presumption was rebuttable by a showing "that the best interests of the child require" that custody be given to someone other than the father. *Id.* at 1205.

that in any event such a preference could be overridden. *Id.* at 1143 (per curiam), 1173–1174 (Ferren, J.), 1188 (Rogers, C.J.). Reading the four opinions together, and considering especially the per curiam opinion, we find it impossible to conclude that the discussion of the best interest standard in *H.R. I* was dictum.

■ Finally, appellant maintains that there have been "factual developments" since the first appeal which render the law of the case doctrine inapplicable. In making this argument, appellant demonstrates once again a misunderstanding of the doctrine. We have held that the mere existence of new facts will not render the doctrine inapplicable unless it can be shown that the court's prior ruling is clearly erroneous in light of those newly presented facts. *See Williams v. Board of Trustees of Mount Jezreel Baptist Church*, 589 A.2d 901, 907 (D.C.), *cert. denied*, — U.S. ——, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991); *Pitts v. District of Columbia*, 391 A.2d 803, 805 n. 1 (D.C.1978). Appellant asserts that because of a "myriad of factual developments," he is no longer seeking a "court-ordered transfer of custody" as he was in *H.R. I*, and therefore the trial court on remand was not bound by the law of the case. These "developments," as appellant calls them, are not of the sort that would render this court's decision in *H.R. I* clearly erroneous.

In *H.R. I* this court prescribed the test which the trial court must apply in considering Mr. and Mrs. O.'s petition for adoption and the concomitant termination of appellant's parental rights. Nothing in *H.R. I* indicates that this test, including a preference for a parent who has grasped his opportunity interest, would have been stated differently if appellant had previously abandoned his request for a court-or-

dered transfer of custody. The issue in the trial court was whether, under the circumstances, the O.'s had proved by clear and convincing evidence that, despite H.R.'s parental preference, it was in the best interest of the child to grant the adoption petition. Appellant's collateral suggestion as to the type of custody order that should be entered if the petition were denied is of no consequence to the trial court's application of the best interest standard, let alone a new factual development which might render the law of the case doctrine inapplicable.

■ For these reasons we hold that we are bound by the law of the case to reject appellant's constitutional claims, as they were unanimously rejected in *H.R. I*. We specifically reject, as inconsistent with the view of the majority (Judges Rogers and Belson) in *H.R. I*, appellant's claim that he has a substantive due process right to custody.[29] As we held in *H.R. I*, appellant's preferential right to the custody of C. may be overridden "by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with [the O. family]." *H.R. I, supra*, 581 A.2d at 1143 (per curiam).

### B. *Appellant's New Argument*

■ Appellant does make one additional argument that was not made in the prior appeal. He contends that, because he is no longer seeking custody, his parental rights may not be terminated without a finding that he is an unfit parent—*i.e.*, that in these circumstances the best interest test runs afoul of the Constitution.

Appellant maintains that the trial court erred in applying the best interest of the child test because it "fails to promote [his opportunity] interest, through the least restrictive means available, when the parent

---

**29.** Judge Ferren, of course, took a different view in *H.R. I*, but his view did not command the support of a majority of the court. Furthermore, even though Judge Ferren said that *Lehr* created in an unwed father a "substantive, constitutionally protected liberty interest" in gaining custody of his child, he ultimately concluded that it was permissible, under the District of Columbia's statutory scheme, for the prospec-

tive adoptive parents to prevail on their petition if they could prove by clear and convincing evidence that the natural parent's custody would be detrimental to the child's best interests. *H.R. I, supra*, 581 A.2d at 1152, 1176–1177 (Ferren, J.). Thus, even under Judge Ferren's more sympathetic view of this issue, appellant cannot prevail.

whose rights are terminated does not seek court-ordered transfer of custody." This court considered and rejected the same argument in *S.S. v. D.M., supra,* 597 A.2d at 883–884. In that case, in which the trial court had granted a petition for adoption by the child's great-aunt and great-uncle, the mother of the child argued on appeal that due process required the court to "adopt the 'least drastic means' possible for achieving the child's best interests." *Id.* at 883. The mother maintained, as appellant does here, that the least drastic means would have been to allow the child to remain in the proposed adopters' custody while continuing to permit visits with her and allowing her to retain her parental rights. In rejecting this contention, we concluded that neither the Constitution nor District of Columbia case law "require[d] the judge to resolve a custody dispute in terms of assuring the fewest possible restrictions on a non-custodial natural parent." *Id.* at 884 (footnote omitted).[30] Additionally, we held that "[e]ven if another trial judge might possibly have concluded that stability for the child could have been achieved without adoption, there was no violation of [the mother's] due process rights." *Id.* Following *S.S.,* we conclude that appellant's argument is without merit and has no support in either the Constitution or in our case law.

While the Supreme Court has held that the rights of natural parents to bring up their children are subject to the protection of the Due Process Clause of the Fourteenth Amendment[31] (and hence the Fifth Amendment), "these rights are not absolute, and must give way before the child's best interests." *In re A.B.E.,* 564 A.2d 751, 755 (D.C.1989) (citation omitted). This court also has recognized that, although the District of Columbia adoption statute incorporates "a preference for a fit unwed father who has grasped his constitutionally protected opportunity interest ... [t]his preference may be overridden if it is shown by clear and convincing evidence that the proposed adoption is in the best interests of the child ... for that interest is the paramount consideration."[32] *In re L.W., supra,* 613 A.2d at 356 (citations omitted); *H.R. I, supra,* 581 A.2d at 1143 (per curiam). Thus, contrary to appellant's assertion, a finding of parental unfitness is not a constitutional prerequisite to granting an adoption petition notwithstanding lack of parental consent. *See In re L.W., supra,* 613 A.2d at 356; *accord, e.g., In re P.G.,* 452 A.2d 1183, 1184 (D.C.1982).

## III

Appellant also argues that "none" of the trial judge's factual findings are supported by the record. Additionally, he asserts that although the trial judge considered the relevant factors set forth in D.C.Code § 16–2353(b) (1989),[33] the trial

30. The court in *S.S.* pointed out that while the Supreme Court in *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982), had "identified a natural parent's interest in the care and custody of his or her child as a fundamental liberty interest, [it had] held only that the decision to terminate parental rights must be supported by clear and convincing evidence. The Court did not also require a least-restrictive-means analysis for balancing the right[s] of the child and the natural parent." *S.S., supra,* 597 A.2d at 884 n. 38.

31. *See Santosky v. Kramer, supra* note 30, 455 U.S. at 753, 102 S.Ct. at 1394.

32. The use of the "clear and convincing evidence" standard in proceedings to terminate parental rights has been held not to violate the Due Process Clause. *Santosky, supra* note 30, 455 U.S. at 768–769, 102 S.Ct. at 1402–1403.

33. D.C.Code § 16–2353 provides in pertinent part:

(b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental, and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental, and emotional needs of the child;

(3) the quality of the interaction and the interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including the foster parent; and

court did not make any *"finding whatsoever that [appellant's] rights are terminable"* (emphasis in appellant's brief). On the latter point, no such "finding" was necessary, for the "terminability" of appellant's rights is an issue of law, not of fact, and was resolved in the prior appeal.[34] On the former point, we hold that the judge's factual findings were amply supported by the evidence, and that appellant's arguments to the contrary are entirely without merit.

"Application of the best interests of the child standard 'in a particular case presents one of the heaviest burdens that can be placed on a trial judge.' ... In reviewing this difficult decision, we will reverse only for an abuse of discretion." *In re D.I.S.*, 494 A.2d 1316, 1323 (D.C.1985) (citations omitted). This standard limits our review to a determination of whether "the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor." *In re R.M.G.*, 454 A.2d 776, 790 (D.C.1982) (citations omitted). Additionally, we must give great deference to the trial court's factual findings and may not set them aside unless they are plainly wrong or without any evidentiary foundation. D.C.Code § 17–305(a) (1989); *see, e.g., In re L.W., supra*, 613 A.2d at 359 ("the 'clearly erroneous' rule applies to [the judge's] factual findings").

The trial judge found that, notwithstanding the statutory preference to which appellant was entitled as C.'s natural father, there was clear and convincing evidence that it was in C.'s best interest to be adopted by the O. family and that it would be detrimental to C.'s interests to deny the petition. Three factors were of particular significance to the judge's decision. The first was "the psychological harm to which the child would be subjected by a denial of

the petition to adopt." The second was "what granting the petition to adopt can accomplish for this child," which included the security that would be provided to the child by granting the petition. The third was the obvious fact that C. had resided with Mr. and Mrs. O. for more than eight years (now more than nine) and that, as a practical matter, the O. family consists of Mr. and Mrs. O. and the two boys, D. and C. The judge stated in her opinion that while the third factor was sufficient in this particular case to overcome appellant's parental preference, she nonetheless would grant the petition to adopt even if it were not present.

The record contains substantial evidence to support the judge's findings. The judge credited, as she was entitled to do, the testimony of Drs. Marans and Solnit, while finding substantial problems with the testimony and credibility of Dr. Noshpitz. She was impressed with the calm and detached demeanor of Dr. Marans and his primary focus on the best interest of C., rather than on the pain of Mr. and Mrs. O. or their other son D. Both Dr. Marans and Dr. Solnit opined that denial of the adoption petition would create a high likelihood of significant psychological harm to C., and each doctor's opinion had a strong evidentiary basis. On the other hand, the judge was unimpressed with the testimony of Dr. Noshpitz. She commented negatively on his demeanor and noted that his discomfort was obvious. At one point she characterized his views as "naive and unrealistic" and explained her reasons for saying so. Additionally, the judge was "deeply troubled" that Dr. Noshpitz had changed his testimony at least twice as to what disposition was in the best interest of the child. She was convinced that Dr. Noshpitz was not successful in "his attempt to be a somewhat objective observer," and that he too

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter. In a 1990 amendment, two additional factors were added to this list. *See* D.C.Code § 16–2353(b) (1992 Supp.). They deal with babies left in hospitals more than ten days after birth and drug-related activity in the child's home. Neither of these factors is relevant to this case, and appellant does not contend otherwise. *See In re L.W., supra*, 613 A.2d at 357 n. 15.

34. As we have discussed in part II–A of this opinion, the court in *H.R. I* was unanimous in concluding that, despite the preferential consideration granted to a parent who has grasped his opportunity interest, that parental preference "can be overridden ... by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with unrelated persons." *H.R. I, supra*, 581 A.2d at 1143 (per curiam).

often focused on balancing the rights of appellant against the rights of the O. family. The testimony of Mr. and Mrs. O. about C.'s place in the family provided additional support for the judge's decision. On this record we cannot find any basis for overturning the judge's findings, nor can we discern any abuse of discretion in her ultimate decision to grant the adoption petition.

Finally, we reject appellant's assertions that the judge manifested bias and prejudice in her conduct of the trial.[35] These assertions are not supported by the record. We note (and appellant concedes) that appellant made no request in the trial court that the judge recuse herself. That fact alone is sufficient to warrant rejection of appellant's claim. *See Browner v. District of Columbia*, 549 A.2d 1107, 1113 (D.C. 1988). The judge's careful application of the statutory "best interest of the child" standard was consistent with this court's prior opinion in *H.R. I* and with all demands of fairness and impartiality.

### IV

In sum, we hold that application of the law of the case doctrine to this appeal is not only appropriate but required. We leave undisturbed, as we must, the holding of *H.R. I:* that the Constitution is not offended by the statutory standard under which the court must determine the best interest of the child, nor does it require the court to accept appellant's alternative plan in lieu of adoption. The record reveals that the trial judge gave careful consideration to the evidence presented and applied the statutory standard with an unrelenting effort to determine C's best interests, while at the same time taking into account appellant's parental preference. The final order of adoption is therefore

*Affirmed.*

---

**35.** Appellant characterizes the judge as having an "obsession with [appellant's] African–French background [which] constitutes an improper negative cultural bias against [him]." In addition, he maintains that the judge had a "pro-adoption bias" that was incompatible with the "performance of her judicial function."